MERCHANTS' EXCH. BANK OF MILWAUKEE, WIS., v. McGRAW, Sheriff.

(Circuit Court of Appeals, Ninth Circuit. October 19, 1896.)

No. 294.

**1. BILL OF LADING—DELIVERY AS SECURITY FOR ADVANCES.**
The Washington statute (Hill's Ann. St. §§ 2407–2413) does not in any manner change the rule that the delivery of a bill of lading as security for an advance of money, with intent to transfer the property in the goods, is a symbolical delivery of them, and vests in the party making the advance a special property, sufficient to enable him to maintain replevin, trover, or any action against one who attaches them upon a writ against the general owner.

**2. SAME—PRESUMPTIONS.**
The issuance of a bill of lading in the name of the consignee does not necessarily vest title in him, but it raises a presumption to that effect which may be controlled by special clauses in the bill, or by evidence aliunde.

**8. SAME.**
Plaintiff guarantied a purchaser's draft for payment of certain goods, under agreement that it should have the goods, bill of lading, and invoice as security. The goods were to be paid for before delivery, but they were placed in a depot, a bill of lading was issued in the purchaser's name, and the draft was subsequently cashed. After the bill of lading issued, and before payment of the draft, the goods were levied on under execution against the purchaser. Held, that the effect of the bill of lading as prima facie evidence of title in the purchaser was overcome by the facts which proved the intention that title should be in the guarantor.

**4. REVIEW ON ERROR—EXCEPTIONS TO INSTRUCTIONS.**

The circuit court of appeals cannot review instructions given or refused in the presence of counsel, when the record affirmatively shows that no exceptions were taken thereto until after the jury retired. But if, after retiring, the jury return for further instructions, which are given in the absence of counsel, it will be sufficient if exceptions thereto are taken as soon as opportunity is offered.

In Error to the Circuit Court of the United States for the District of Washington, Northern Division.

This was an action by the Merchants' Exchange Bank of Milwaukee, Wis., against John H. McGraw, sheriff, to recover damages for the alleged wrongful conversion of 100 bales of hops. From a judgment in favor of defendant, plaintiff brings error.

This action was brought by the plaintiff in error, a banking corporation of Milwaukee, Wis., against the defendant in error, sheriff of King county, Wash., to recover damages for the alleged wrongful conversion of 100 bales of hops. The plaintiff, in its amended complaint, alleged general ownership and right of possession in the hops, December 15, 1890, and down to January 27, 1891; that the defendant, at Seattle, in King county, Wash., unlawfully took possession of the hops December 15, 1890, and continued his possession until January 29, 1891, when he unlawfully converted and disposed of the same, to the plaintiff's damage. The defendant, in his answer, denied plaintiff's ownership and right of possession, and affirmatively alleged that on December 8, 1890, the hops were owned by and were in the possession of A. F. Luening & Co., at Seattle, King county, Wash.; that in an action brought against Luening & Co. by G. F. Livesley & Co., in the superior court of King county, the defendant, as sheriff, duly attached the hops as the property of Luening & Co.; that afterwards, on June 29, 1891, he duly sold the same under and by virtue of an execution issued upon the judgment rendered in that action. The plaintiff filed an amended reply, denying that Luening & Co. ever were the owners of the hops, or had any property in them, and affirmatively alleged that the defendant should not be permitted to plead title in Luening & Co., or the levy of attachment or execution upon the hops in the action of Livesley & Co., because the plaintiff had, on December 8, 1890, purchased 69 bales of the hops of Livesley & Co.; that on that day Livesley & Co., at Seattle, sold and delivered such hops to the plaintiff; that in the same way one Catlin had, at the same time and place, sold and delivered to plaintiff the remainder of the 100 bales of hops; that at that time Livesley & Co. and said Catlin knew that plaintiff had advanced the money for Luening & Co.; that Livesley & Co. concealed from plaintiff the fact of their having any demand against Luening & Co.; that their course was fraudulent against plaintiff; that the hops were purchased at Seattle for the benefit of Luening & Co., but that the purchase was made by the plaintiff; that plaintiff at the time paid the purchase price to the vendors, and that it then and there received the title and possession of the hops from them. Upon the first trial the court granted a nonsuit at the close of plaintiff's testimony. The case was then presented to this court upon writ of error, and the judgment of the circuit court was reversed. Bank v. McGraw, 8 C. C. A. 420, 59 Fed. 972. On the third trial the jury found a verdict in favor of the defendant. The present record discloses substantially the same facts as set forth in the former opinion, except that it did not then "appear from the testimony whether the levy was made before or after the negotiation of the draft at the Seattle bank."

The facts upon the last trial are as follows: About December 2, 1890, August F. Luening, of Milwaukee, a sole trader, as A. F. Luening & Co., in the business of buying and selling hops, ordered and contracted for 100 bales of choice hops from Kuehn, Metzler & Co., who were brokers and dealers on commission in hops at Seattle. The price of said hops was 32 cents per pound at Seattle, and the understanding was that they were to be paid for in cash at Seattle before shipment from Seattle to Milwaukee. Luening had no money to pay for the hops at that time, and applied to plaintiff, of which he was a regular customer, to grant him a credit or guaranty a draft to be drawn by Kuehn, Metz-

ler & Co. on him for the amount of his purchase, in order that the draft might be cashed at Seattle. Luening was then largely overdrawn in his account as a depositor of the plaintiff, and for that reason his credit with plaintiff was not good for such a guaranty without security; but, upon his stating that the bank should have the security of the hops and bill of lading, it was then agreed between the plaintiff and Luening that such guaranty would be made for him by the bank on the security of the hops, and that the bank should have the hops. the bill of lading, and the invoice bill of the hops as its security. The plaintiff then telegraphed to the First National Bank of Seattle as follows: "Draft Kuehn, Metzler & Co. on A. F. Luening & Co. for one hundred bales hops at 32 cents per pound B. L. and value bill attached will be paid. Mer. Ex. Bk." The First National Bank had previously refused to cash such draft on the security of the hops as an independent banking transaction, and in its subsequent conduct relied on this guaranty. The guaranty was communicated to Kuehn, Metzler & Co., who thereupon contracted with George F. Livesley & Co., a firm of hop dealers at Seattle, for the purchase of 69 bales of hops, and with Jerome Catlin, another hop dealer at Seattle, for the purchase of 31 bales,— each lot at 31½ cents per pound. Kuehn, Metzler & Co. did not disclose to either of said dealers their principal's name, but did inform George F. Livesley & Co. that their purchase was on account of an order; and they were known by each of said dealers to be engaged in the hop business as commission men. No specific terms as to time of payment were agreed on with said dealers, but there seems to have been a tacit understanding that it was a cash transaction, such as is usual between brokers of agricultural products. On December 6 or 8, 1890, said 69 bales were delivered by said George F. Livesley & Co. to Kuehn, Metzler & Co., and accepted by them. About the same time the 31 bales were delivered by Catlin, and accepted. Each lot was marked by Kuehn, Metzler & Co. with a distinguishing mark, and the whole were billed at the freight warehouse at Seattle, on the morning of December 8th, over the Northern Pacific Railroad to A. F. Luening & Co., at Milwaukee. The railroad company issued and delivered to Kuehn, Metzler & Co. a railroad bill of lading, in the usual form, on a printed blank, for 100 bales of hops, describing their marks and approximate weight, and naming Kuehn, Metzler & Co. as consignors, and A. F. Luening & Co., Milwaukee, Wis., as consignees, and stipulating for carriage and delivery to consignee or order. Shortly before or after the bill of lading was issued, Livesley & Co. ascertained, either from Kuehn, Metzler & Co. or by inquiry at the freight office, that they were bought for Luening, and thereupon had legal papers prepared for a suit and attachment against Luening upon a former indebtedness of him to them, not arising out of or connected with this transaction. A writ of attachment was issued from the superior court of King county, Wash., in favor of George F. Livesley & Co., plaintiffs, against A. F. Luening, defendant, about 1:20 o'clock p. m. of December 8th, and placed in the hands of the defendant as sheriff, and shortly thereafter levied by him on the 100 bales, being still at the warehouse, and under said consignment. After the issue of said bill of lading the consignors prepared a value bill or invoice of the hops, stating their marks, weight of each bale, total gross and net weights, the total price at 31½ cents per pound, with 1 cent per pound added for their commission, and the fact of drawing a draft for the whole, $6,548.42, on A. F. Luening & Co., and signed the same. They also drew such draft, payable to the order of the First National Bank of Seattle, and took said draft, bill of lading, and invoice, retaining the duplicate bill of lading, to the First National Bank of Seattle, about 3 o'clock p. m. of December 8th. Thereupon said draft, with the bill of lading and invoice attached, was delivered by them to the bank, and the amount of the draft, less discount and exchange, was credited by the bank on its books to Kuehn, Metzler & Co., who were customers of it. Both of the Livesleys were active in the attachment, but, after the attachment, and before the draft was cashed, George F. Livesley had been at the office of Kuehn, Metzler & Co., followed Mr. Kuehn to the bank, and got his check there for the 69 bales shortly after the deposit. During this transaction the Livesleys did not inform Kuehn, Metzler & Co. of the attachment, nor did they or the bank know of it until afterwards. On the same or the next day, Kuehn, Metzler & Co. paid Catlin the price of his 31 bales by their check drawn on the same bank account. The bank forwarded said draft, bill of lading, and invoice by mail to the plaintiff, with instructions to remit the

amount to the bank's correspondent at Chicago. These papers reached the plaintiff on or about December 15th, and the draft was presented to Luening, and payment demanded, but refused by him, because the draft was drawn for one-half cent per pound too much, and the hops had been attached. The draft was then protested. The plaintiff then wired to the Seattle bank that fact, and Luening's reasons. The Seattle bank replied by wire, insisting that the amount was correct, and the plaintiff must pay the draft, because it had been cashed in reliance on its guaranty. Later on the same day, December 15th, the Seattle bank ascertained from Kuehn, Metzler & Co. that the draft was drawn for one-half cent per pound too much, and them draw a new draft for $6,434.88 in the same form as the first, forwarded that draft to the plaintiff with the same instructions, and wired the plaintiff to that effect, and also wrote a letter explaining the overcharge. The second draft was received by the plaintiff on December 20th, and the bill of lading, which had meantime remained in the possession of the plaintiff, was indorsed in blank by Luening, and was retained by the plaintiff, and the amount of the second draft remitted by it to the credit of the Seattle bank with its Chicago correspondent. Luening has never paid to the plaintiff any part of the draft. A demand in plaintiff's behalf for the hops was made upon the defendant a few days after the levy, and he refused to surrender them, and afterwards sold them under execution on a judgment entered on default of Luening in the attachment suit.

Charles E. Shepard and Sylvester & Scheiber, for plaintiff in error.
Struve, Allen, Hughes & McMicken, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after stating the facts). The various assignments of error which are relied upon by the plaintiff call in question the correctness of the charge of the court to the jury, and the refusal of the court to give the instructions asked by the plaintiff. The questions for decision are: Did the transactions between Livesley & Co. and Catlin, with Kuehn, Metzler & Co., vest in Luening & Co. an attachable interest in the hops, prior to the deposit of the bill of lading and invoice, and the cashing of the draft by the First National Bank of Seattle as the agent of the plaintiff? Did the plaintiff, by reason of the transactions set forth in the statement of facts, acquire the possession, or right of possession, or any valid title or interest in, or lien upon, the hops, as security for the advances by it made? To whom were the hops delivered? What was the intention of the parties?

When this case was here before, the question was presented whether the title to the hops passed to Luening & Co. This court, following the established doctrine of the decided cases, said:

"That whether or not the title to goods passes upon delivery depends upon the intention of the parties, and that the intent may be inferred."

In the light of the facts then presented we held:

"That there was evidence to go to the jury tending to prove that, up to the time of the delivery of the bill of lading to the bank at Seattle, the title to the hops remained in Kuehn, Metzler & Co., and that by the cashing of the draft, and the delivery of the bill of lading to that bank as the plaintiff's agent, the title passed to the plaintiff."

There are numerous authorities which, in substance, declare that the delivery, by an owner of goods, of a common carrier's receipt for them, as security for an advance of money with the intention to transfer the property in the goods, is a symbolical delivery of them,

and vests in the person making the advance a special property in the goods, sufficient to enable him to maintain replevin or trover, or other action at law, against another who attaches them upon a writ against the general owner. Dows v. Bank, 91 U. S. 618, 633; Means v. Bank, 146 U. S. 620, 627, 13 Sup. Ct. 186, 189, and authorities there cited; Bank v. Wright, 48 N. Y. 1, 3; Bank v. Logan, 74 N. Y. 568, 579; Forbes v. Railroad Co., 133 Mass. 154; Tilden v. Minor, 45 Vt. 196; Railway Co. v. Johnston (Neb.) 63 N. W. 144, 146; Mershon v. Moors, 76 Wis. 502, 514, 45 N. W. 95, 96; Rosenbaum v. Hayes (N. D.) 67 N. W. 951. Numerous other cases might be cited to the same effect.

This general principle, as announced and applied to the facts in the cases cited, under the common law or upon the statutes of the different states, is not denied by the defendant in error. But its application to the state of facts presented in this case, especially under the peculiar provisions of St. Wash. 1885–86, p. 121 (Hill's Ann. St. §§ 2407–2413), is disputed. But we are of opinion that there are no provisions in the statutes of Washington which in any manner change the rule, as above stated, in its application to the facts of this case.

The contention of the defendant in error that the plaintiff in error is estopped from recovery herein by the fact that it denied in its pleadings that Luening & Co. ever had any title, ownership, or possession of the hops, and based its right to recover upon the ground of its general ownership and right of possession in the hops, cannot be sustained. The agreement, made between Luening & Co. and the plaintiff, that the hops should be held by the plaintiff as security for any money advanced by it for the purchase of the hops, would, when completed, create such a title as conferred upon it the right to bring suit as the owner or party having what is designated in the decisions upon this subject as the "bankers' title" to the goods. This doctrine has been developed in furtherance of the security required in commercial transactions, and it is now well settled, as was said by the supreme court of Wisconsin in Mershon v. Moors, supra, that:

"Where a commercial correspondent advances money for the purchase of property, and takes possession, either actually or symbolically, he becomes the owner thereof, even when the advance was made and the property was purchased at the request and for the ultimate use and profit of another, and there was an agreement to transfer the title to that other upon the performance of certain conditions, and ownership was taken solely for the protection of the party making the advance."

The court, among other things, charged the jury as follows:

"If you find, from the evidence in this case, that the plaintiff did make a contract of guaranty, and that, pursuant to the terms of that contract on its part, the First National Bank of Seattle discounted the draft of Kuehn, Metzler & Co. upon Luening, and took from Kuehn, Metzler & Co. the bill of lading of the hops consigned to Luening, with the value bills attached, according to the terms of the contract of guaranty, then you must find that the plaintiff by that transaction, by the payment of the money pursuant to its contract of guaranty, did acquire a right, a valid right, to hold the hops as security,—a right to have possession of them,—which was good as against Luening & Co., and sufficient to entitle the plaintiff to recover in this case, unless the defendant had, prior to that time, acquired by virtue of legal

process a superior right to the possession of the hops. * * * If, at the time the sheriff received the attachment, and by virtue of it assumed to take the hops into his custody, Luening was the owner of the hops; if the title had actually been transferred to Luening and they were in Luening's possession, and the plaintiff in this case had not then acquired a lien upon the hops,—the right of the sheriff would be superior to any right afterwards acquired by the plaintiff. * * * The intention of the seller and the purchaser governs the question of whether title passes by delivery or not. If there is an absolute, actual delivery, that is unconnected with any restrictions or reservations, the delivery passes title. The transfer of title to personal property takes place when the parties have agreed, for a sufficient consideration, that the title shall pass from the seller to the purchaser. * * * If the jury find, from the evidence, that it was the understanding and the intent of the parties that the hops should be paid for at Seattle, by the proceeds of a draft drawn by A. F. Luening & Co., before the title vested in Luening, or the hops left Seattle, then the fact of the delivery of the hops at the warehouse, or taking out the bill of lading in the name of A. F. Luening & Co., and marking the bales with their names and address, did not, of itself, pass the title to Luening, before payment for the hops by means of the draft. The jury must consider these facts, with all others in the case, to arrive at the true intent of the parties to the transaction. If the deposit and delivery of the bill of lading at the First National Bank of Seattle was made by the owner of it, in person or by his agent, in accordance with the understanding and intent of the plaintiff and Luening that it should be done as security for the plaintiff for the draft, it is not necessary that the bill of lading should first be indorsed by Luening, and their intent became effectual and vested title for security in the plaintiff immediately on the deposit of the bill of lading. * * *"

But, in addition to these portions of the charge, the court gave certain abstract principles of law, independent of the question of the intention of the parties, to the effect that the time when the contract of guaranty became fixed was at the time when the Seattle bank obtained possession of the bill of lading, and paid the money by discounting the draft drawn by Kuehn, Metzler & Co. upon Luening & Co., and that when Kuehn, Metzler & Co. "placed the hops in the transfer company's warehouse, and shipped them by the Northern Pacific Railroad Company, consigned to A. F. Luening & Co., and took the bill of lading showing Luening & Co. to be the consignees of the hops, there was a delivery to Luening & Co. A delivery to a carrier is a delivery to the consignee. Kuehn, Metzler & Co. might have taken the bill of lading to be delivered to the order of the consignors; but this bill of lading is a bill of lading to Luening & Co., and the delivery to the carrier, and the taking a railroad receipt for the hops, showing that they are consigned and to be delivered to the consignee, is a delivery, in contemplation of law, to the consignee."

It is argued that these portions of the charge were calculated to, and did, mislead the jury from the real and only questions of fact as to the intention of the parties. It is, however, contended by the defendant in error that this court cannot review the charge of the lower court in this respect, because the record affirmatively shows that no exceptions were taken to the charge of the court, or to the refusal of the court to give instructions asked by plaintiff, until after the jury had retired to deliberate upon their verdict. This contention must be sustained. The national courts have uniformly and repeatedly declared that, in order to be of any avail, the exceptions to the charge of the court, and to other instructions given or refused, or any other rulings of the court, must be taken before the jury re-

tires to deliberate upon their verdict. Bracken v. Railway Co., 5 C. C. A. 548, 56 Fed. 448; Sutherland v. Round, 6 C. C. A. 428, 57 Fed. 467; Park Bros. & Co. v. Bushnell, 9 C. C. A. 138, 140, 60 Fed. 583, 585; Stone v. U. S., 12 C. C. A. 451, 460, 64 Fed. 668, 677; Railway Co. v. Spencer, 18 C. C. A. 114, 71 Fed. 93; Johnson v. Garber, 19 C. C. A. 556, 558, 73 Fed. 523, 526; Walton v. U. S., 9 Wheat. 651, 658; Phelps v. Mayer, 15 How. 160; Turner v. Yates, 16 How. 14, 29; U. S. v. Breitling, 20 How. 252; Dredge v. Forsyth, 2 Black, 563, 568; French v. Edwards, 13 Wall. 506; Stanton v. Embrey, 93 U. S. 548, 555; Hunnicutt v. Peyton, 102 U. S. 333, 358; U. S. v. Carey, 110 U. S. 51, 3 Sup. Ct. 424; Bank v. Eldred, 143 U. S. 293, 298, 12 Sup. Ct. 450, 452; Thiede v. Utah Territory, 159 U. S. 511, 522, 16 Sup. Ct. 62, 67. A strict enforcement of this rule is absolutely essential to the proper and intelligent administration of justice. It often serves to correct inaccurate, inadvertent, or misleading expressions in the charge of the court. It affords an opportunity for explanations and qualifications which might otherwise be overlooked. It is not merely formal or technical. It was introduced, and should be adhered to, for purposes of justice. The exceptions, when taken, should be specific and direct, so as to call the attention of the court to the particular point which is claimed to be erroneous. The practice of allowing counsel to take exceptions to the charge, or instructions, after the jury has retired, except in cases where the charge complained of was given in the absence of counsel, should be discontinued, because the allowance thereof simply incumbers the record, and creates unnecessary expense in the printing of the record and briefs of counsel upon points that will not be considered by the appellate court. The proper practice is to inform counsel that, if they desire to take any exceptions to the charge, it must be done before the jury retires. It is not necessary that a bill of exceptions should be formally drawn up and signed. It will always be sufficient if the exceptions be taken and noted at the time with sufficient certainty, and may afterwards, during the time allowed by the rules, or within such time as the court may allow, be reduced to form and signed by the judge.

But the record shows that, after the jurors had retired to deliberate upon their verdict, they twice returned into court and requested further instructions, and that the court, in the absence of counsel, gave certain instructions to them, and that exceptions were taken thereto by the plaintiff at the earliest opportunity afforded counsel so to do. These instructions, so given, are, therefore, properly before us for review, and present substantially the same objections that were urged by counsel to the general charge of the court. We copy from the record:

"A Juror: Am I to understand, your honor, that the matter we have to decide—that is, that one important matter for our consideration—is the period of time at which the title passed to the plaintiff? Am I correct about that? The period at which the title passed, whatever it might be? The Court: That is one of the important facts that is necessary for you to decide, because you will have to decide which is first in order to determine which is superior,— whether the lien which the plaintiff claims is superior by reason of being acquired before the attachment was levied, or whether the attachment is superior

by reason of having been levied before the plaintiff had acquired a vested right."

This instruction was certainly calculated to mislead the jury. It was equivalent to, and must have been considered by the jury as, an instruction to find a verdict in favor of the defendant, because there was no controversy as to the fact that the attachment was levied upon the hops before the bill of lading was delivered to the bank. We quote further from the record:

"A Juror: There is also one other question we would like to know about, and that is, what constitutes possession? There seems to be a difference of opinion about when possession actually takes place. The Court: The delivery of possession took place when the hops were consigned to Luening by the issuance of the railroad receipt, or 'bill of lading,' as it is termed. When the railroad company issued that receipt and delivered it to Kuehn, Metzler & Co., that is when the possession was complete in Luening & Co."

The mere taking out of a bill of lading in the name of Luening & Co. did not, of itself, necessarily vest the title in Luening & Co. The question was one of fact, and depended upon the intention of the parties. If it was the intention of the parties that Kuehn, Metzler & Co. should retain possession of the bill of lading, and deliver it over to the First National Bank of Seattle, in pursuance of the agreement between Luening & Co. and the plaintiff in error, upon the delivery of which the money for the purchase of the hops was to be advanced by the Seattle bank, as the agent of plaintiff, and the bill of lading to be forwarded to the plaintiff in error at Milwaukee, as security for the advance thus made, then the title did not pass to Luening & Co., and the hops were not subject to attachment, except as to the surplus of the value thereof, if any, over and above the purchase price paid therefor. The controlling question as to the various transactions touching the sale, delivery, and possession of the hops "is," as was said by the court in Hatch v. Oil Co., 100 U. S. 124–131, "rather one of intention than of strict law, the general rule being that the agreement is just what the parties intended to make it, if the intent can be collected from the language employed, the subject-matter, and the attendant circumstances." The effect of a consignment of goods is, generally, to vest the property in the consignee. The effect of such a bill of lading as evidence is to raise a presumption of property in the goods in him to whom it makes them deliverable. Lawrence v. Minturn, 17 How. 100, 107; Scharff v. Meyer (Mo. Sup.) 34 S. W. 858, 861; Krulder v. Ellison, 47 N. Y. 37. But this effect may be controlled by special clauses in the bill of lading, or by evidence aliunde. It is also true that a delivery to the carrier is a delivery to the vendee, and the property vests immediately, unless there is some agreement or understanding to the contrary. This is true, whether the consignee named in the bill of lading is the real purchaser of the goods, or the party who has made advances for the purchase of the goods.

In Dows v. Bank, the supreme court said:

"We agree that, where a bill of lading has been taken containing a stipulation that the goods shipped shall be delivered to the order of the shipper, or to some person designated by him other than the one on whose account they have been shipped, the inference that it was not intended the property in the

goods should pass, except by subsequent order of the person holding the bill, may be rebutted, though it is held to be almost conclusive; and we agree that, where there are circumstances pointing both ways, some indicating an intent to pass the ownership immediately, notwithstanding the bill of lading,—in other words, where there is anything to rebut the effect of the bill,—it becomes a question for the jury whether the property has passed."

In Prince v. Boston & L. R. R., 101 Mass. 542, 546, the court said:

"It is too well settled to need a citation of cases that a delivery to a carrier with intent on the part of the vendor or consignor to pass the property, either absolutely or specially, to the purchaser or consignee, who has made advances, is effectual as a delivery to that end. The carrier is, in such cases, in contemplation of law, the bailee of the person to whom, and not by whom, the property is sent. And a delivery to him, with no jus disponendi reserved to the shipper, is as effectual as if to the consignee himself. It is always a question of the intention with which the act is done; and all acts, declarations, and circumstances accompanying it, and which indicate its purpose, are admissible in evidence."

Benj. Sales, §§ 418, 1190, 1211, note 10; 1 Jones, Liens, § 462.

The question which must necessarily dispose of this case is clearly and correctly stated in the former opinion of this court, where many authorities bearing directly upon the subject were reviewed. We then stated, and again repeat, that:

"In the case before the court there is nothing from which it may be inferred that there was an intention that the title to the hops should pass to the purchaser before payment of the purchase price, save and except the fact that they were delivered by the consignors to the carrier for transportation, consigned to A. F. Luening & Co., and that a bill of lading was made out to that effect. These facts alone would amount to proof prima facie that the consignees were the owners. Their effect as evidence, however, is overcome by the other facts in the case,—by the fact that the goods were to be paid for before delivery, that the purchase money was to be procured by pledge of the goods upon a draft with the bill of lading attached, and by the further fact that the possession of the bill of lading was to be retained by Kuehn, Metzler & Co. until they should receive payment."

Common honesty demands that agreements of this character, made in good faith, should be protected by the courts. Especially is this true where, as in the present case, the attaching parties have not been misled, and do not stand in the light of innocent purchasers. In Tilden v. Minor, supra, the court said:

"The movement of the immense products of the West to the seaboard involves the use of large sums of money, which requires confidence and credit. To insure that, the bill of lading has been regarded in law as the symbol and representative of the cargo. The assignment for honest purposes of the bill of lading is effectually the assignment of the cargo; and since railways have made continents navigable as well as the sea, and immense products and almost limitless tonnage are floated by their agency to the great central depots of commerce, the propriety and necessity of the rule become more apparent, and the duty of the court to make it certain and inflexible more obvious."

The judgment of the circuit court is reversed, with costs in favor of plaintiff in error, and the cause remanded for a new trial in conformity with the views herein expressed.