CENTURY THROWING CO. v. MULLER et al.

(Circuit Court of Appeals, Third Circuit. June 10, 1912.)

No. 17 (1,585).

1. CARRIERS (§ 58*)—BILL OF LADING—BANKER'S TITLE—ADVANCES TO PAY FOR GOODS—DELIVERY ON TRUST RECEIPT.

A bank which, under an arrangement made in accordance with well-established commercial custom, furnished credit for the purchase of goods for import by acceptance of a draft at six months, and took the bills of lading in its own name, became the legal owner of the goods, and not merely a pledgee, and its title was not divested by permitting the company for which the importation was made to take the goods on signing a trust receipt binding it to hold the same or their proceeds for the bank until it paid the purchase price. In such case, where the transaction was in good faith, it is not fraudulent in law, and the courts will recognize and protect the bank's title as against one to whom the company in possession attempted to pledge the goods.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 179–190; Dec. Dig. § 58.*]

2. BAILMENT (§ 18*)—LIEN—NEW JERSEY STATUTE—THROWSTER'S LIEN.

The throwster's lien given by 3 Comp. St. N. J. 1910, p. 3140, § 66, on goods coming into their possession for treatment for accounts due them

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

for work done on "other goods of such owner or owners," must be limited to actual ownership, as distinguished from apparent ownership due to possession, and a bailee cannot subject goods in his possession to a lien for work done on other goods in which the owner of the bailed goods had no interest.

[Ed. Note.—For other cases, see Bailment, Cent. Dig. §§ 77–79, 81, 84; Dec. Dig. § 18.*]

In Error to the Circuit Court of the United States for the District of New Jersey.

Action at law by Frederick Muller, William Schall, Jr., Carl Muller, and Edmund Pavenstedt, partners trading as Muller, Schall & Co., against the Century Throwing Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

John W. Griggs (John W. Harding, of New York City, of counsel), for plaintiff in error.

Rounds, Hatch, Dillingham & Debevoise (Ralph S. Rounds, of New York City, of counsel), for defendants in error.

Argued before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge. The defendants in error, Muller, Schall & Co. (hereinafter called the plaintiffs) brought an action in trover in the court below against the Century Throwing Company, the plaintiff in error (hereinafter called the defendant). At the conclusion of the evidence, and before the case was submitted to the jury, both the plaintiffs and the defendant moved for the direction of a verdict. The learned judge of the court below refused the motion of the defendant and granted that of the plaintiffs, and from the judgment upon the verdict so directed (which was for damages amounting to $3,516.-51) this writ of error was sued out by the defendant.

The action was for the recovery of damages for the detention of 888.9 pounds of raw silk, which plaintiffs claim as their property and allege that the defendant had converted. The material facts are as follows:

Vivanti Bros. were purchasers or brokers in the purchase and sale of raw silk, doing business in New York City and Yokohama, Japan. Neuberger-Phillips Silk Company was a New Jersey corporation, manufacturing silk goods in Paterson. The defendant company was engaged in throwing raw silk, an operation which consisted of twisting, spinning and preparing the raw silk for manufacture. This operation was well known in the silk trade, and carried on by various concerns, for manufacturers, at a certain price per pound.

Wishing to purchase raw silk in Japan, the Silk Company arranged with Vivanti Bros., in January, 1910, for the purchase of a quantity of the same at Yokohama, and in February, 1910, the Silk Company were notified by the said silk brokers that the purchase had been made as ordered. Under this arrangement, the shipment was to be made on the basis of a six months' sight draft drawn against the silk, provided

that payment of the same should be guaranteed by a banker's letter of credit. Such letter of credit, in order to accomplish this importation, was obtained by the Silk Company from the plaintiffs, who were bankers doing business in New York, and was as follows:

"Muller, Schall & Co., Bankers, 44-46 Wall Street.

"No. 6169, for £3,000.

"New York, February 9, 1910.

"Messrs. Vivanti Bros., Yokohama.

"Dear Sirs: We hereby open a credit in your favor for three thousand pounds Sterling for account of the Neuberger, Phillips Silk Co., Paterson, New Jersey, to be used by your Drafts on Direction der Disconto Gesellschaft, London, at 4 or 6 months' sight for Invoice cost of Raw silk to New York. And we agree with yourselves as Drawers and with the Endorsers, and bona fide holders respectively of your drafts, that they will be duly accepted on presentation in London by Direction der Disconto Gesellschaft on receipt of due advice, provided they are drawn as aforesaid and accompanied by one Bill of Lading, insurance certificate and abstract of invoice (Original and Duplicate draft to be accompanied by one Bill of Lading and abstract of Invoice each). The other Bills of Lading are to be sent direct to Messrs. Muller, Schall & Co., New York, one of which with Consular Invoice by the Vessel carrying the goods. The Bills of Lading have to be made out to the order of Muller, Schall & Co. The Marine Insurance on the shipments hereunder is cared for by the shippers. This Credit to be in force in Yokohama till June 1, 1910. Please fill up drafts as follows: 'Against Letter of Credit No. 6169. Dated New York, February 9, 1910.'

"We are, Dear Sirs, Your obedient Servants,

"Muller, Schall & Co."

Upon obtaining this letter of credit, the Silk Company made the following acknowledgment:

"New York, February 9, 1910.

"Mess. Muller, Schall & Co., New York City.

"Dear Sirs: We beg to acknowledge having received from you Letter of Credit No. 6169, and we hereby confirm to you that the Letter of obligation which we signed for previous Letter of Credit in favor of Messrs. Vivanti Bros., Yokohama, is also to be considered in force for and to apply to the above mentioned Letter of Credit.

"Yours very truly.          Neuberger-Phillips Silk Co.,

"By I. Neuberger, Pst."

Relying upon the plaintiffs' guaranty, as set forth in this letter of credit, Vivanti Bros., on February 15, 1910, shipped the silk to New York, taking a bill of lading, deliverable to the order of plaintiffs. The duplicate bills of lading, with the consular invoice, were sent direct to the plaintiffs and in due course received by them, as was also the original bill of lading attached to the draft. About March 11, 1910, the goods themselves arrived in New York, and on the same day the plaintiffs indorsed the bill of lading and delivered it to Mr. Neuberger, president of the Silk Company, receiving from him at the same time the so-called trust receipt, signed on behalf of his company. This trust receipt read as follows:

"Received from Messrs. Muller, Schall & Co. the merchandise specified in the Bill of Lading per S. S. 'Inaba Maru' to N. Y. via Seattle.

F V.

206/235                                    30 bales' raw silk.

imported under the terms of their Letter of Credit No. 6169 issued for our account, together with Consular Invoice, Invoice and Insurance Policy; and

in consideration thereof, we agree to hold the said merchandise, on storage, as the property of Messrs. Muller, Schall & Company, and subject to their order, with liberty to sell the same for cash, and in case of sale to pay over to them the proceeds as soon as received, to be held and applied by them against the acceptances of Direction der Disconto Gesellschaft, London, on our account under the terms of the said Letter of Credit and to the payment of any other liability or indebtedness of ours to Messrs. Muller, Schall & Company or to Direction der Disconto Gesellschaft, London, the intention being to protect and preserve unimpaired the title of the said Muller, Schall & Company to the said merchandise and the proceeds thereof. It is further agreed that the undersigned shall keep said merchandise insured against fire at its full value, loss, if any, payable to Messrs. Muller, Schall & Company, and that said Muller, Schall & Company shall not be chargeable with any storage, insurance premiums or other expenses incurred thereon, and that nothing in this Receipt contained shall impair or alter any of the provisions or obligations of the said Letter of Credit or of our agreement accepting the same.

"New York, 3/11/10.

"Neuberger-Phillips Co., by J Neuberger, Pst."

The draft drawn on the London bankers for the purchase price, with bill of lading attached, payable six months after sight, was presented and accepted in London on March 8, 1910, in accordance with the stipulations of the letter of credit, thus becoming payable in London September 8, 1910. On March 17, 1910, the plaintiffs made the following written statement to the Silk Company:

"Muller, Schall & Co., 44–46 Wall Street.

"To the Neuberger-Phillips Silk Co., New York City.

"New York, March 17, 1910.

"Dear Sir: We have received from Direction der Disconto Gesellschaft, the following advice of maturities for your account.

| Under L/c Amount | Due in | Due in N. Y. | Valued Against |
|---|---|---|---|
| No. | London | | |
| 6169 6m/s 3,137.11/–Sept. 8, '10 | Aug. 27, '10 | 30 bales raw silk per S. S. 'Inaba Maru' |

"Yours truly,                                    Muller, Schall & Co."

[1] When the plaintiffs handed over to the Silk Company the possession of the silk, by indorsing and delivering the bill of lading, there is no direct evidence that it was for the purpose of passing title to the Silk Company, or waiving or abandoning any of their rights of property, as security for the liability incurred by reason of their acceptances of the purchase money drafts, which were to be cared for at maturity by the Silk Company. On the contrary, that there was no such purpose may legitimately be inferred from the facts as testified to and from the stipulations of the letter of credit, apart from the trust receipt. The trust receipt, however, given by the Silk Company expressly negatives such purpose, by setting forth the nature and character of the transaction under which the silk was delivered by the plaintiffs to the Silk Company, and closing with the stipulation "that nothing in this receipt contained shall impair or alter any of the provisions or obligations of the said letter of credit or of our agreement accepting the same."

· Shortly after receiving the bill of lading from the plaintiffs, which was necessary in order to enable it to receive possession of the goods from the carrier, the Silk Company handed over a portion of the importation of 30 bales to the defendants, as throwsters, to be thrown by them. It seems that before the silk here in question was offered to the defendant to be thrown, the defendant had had deposited with it other silk for the same purpose, which had been already thrown. The Silk Company, desiring to get possession of this silk, found that the defendant was unwilling to deliver the same without payment of a claimed lien thereon for an indebtedness which amounted to several thousand dollars. It was then agreed that the defendants should deliver this thrown silk to the Silk Company, and should receive the raw silk here in question from the Silk Company, and hold the same as security, not only for the throwing of it, but for this past indebtedness.

Shortly after the defendant got possession of the silk in question, the Silk Company was adjudicated a bankrupt, on a petition filed April 12, 1910. On April 13, 1910, a receiver of the alleged bankrupt was appointed and duly qualified, and on April 18, 1910, plaintiffs preferred their petition to the District Court, in bankruptcy, for the Southern District of New York, stating the fact of the petition in bankruptcy and the appointment of a receiver, as also the facts in relation to the transaction between the plaintiff and the Silk Company as to the raw silk here in question, and stating that part of the same was in possession of the receiver and the remainder in the possession of the defendant and other throwsters; also that plaintiffs had demanded of the receiver that he deliver up to them all of the said 30 bales of silk, or any part thereof in his possession or control; and that the said receiver had refused so to do.

In consideration of the premises and the prayer of the petitioners, the court, on the 23d day of April, 1910, ordered that the receiver deliver to Muller, Schall & Co., as their property, certain portions then in his possession of the said 30 bales of raw silk, which had been delivered by said Muller, Schall & Co. to the alleged bankrupt, as bailee, on or about March 11, 1910; "without prejudice, however, to any rights which the alleged bankrupt or its receiver may have against Muller, Schall & Co. for any charges which either the alleged bankrupt or its receiver has incurred or paid, or shall be compelled to pay, for throwing, dyeing, or otherwise increasing the value of any part of said silk after it came into the possession of the alleged bankrupt on March 11, 1910, or to the claim of Muller, Schall & Co. that they are under no obligation whatsoever to the alleged bankrupt, or its receiver, because of any such charges. * * * The question of such liens to be determined in this court, to the summary jurisdiction of which for that purpose the said Muller, Schall & Co. shall be deemed to consent by the acceptance of the silk included in this order." The receiver was further authorized by the said order of the court to "consent to the delivery to Muller, Schall & Co.," by certain named parties, "of the silk in their possession belonging to Muller, Schall & Co.," including the 888 pounds in the possession of the

Century Throwing Company, "without prejudice to the rights of either the receiver or Muller, Schall & Co. in regard to any charges for work done on said silk." The receiver thereupon informed the defendant, in writing, of the said order of the court, stating that it was determined thereby that the said 888 pounds of silk delivered to the defendant by the Silk Company, in March, 1910, was at the time of said delivery, and had always continued to be, the property of Muller, Schall & Co. (the plaintiffs), and not of the Silk Company, and that he, the receiver, "had been directed by order of said court to notify you, as I hereby do, that I consent to the delivery by you to that firm of the said silk." Demand was afterwards made upon the defendant by the plaintiffs for the delivery of said silk, and upon refusal thereof this action of trover was brought in the court below.

As already stated, before the case was submitted to the jury and after motions on both sides for the direction of a verdict had been made and argued, the court granted that of the plaintiffs, and from the judgment on the verdict so directed this writ of error was sued out by the defendant.

It is contended by the defendant that the ordinary rule that, where both parties request a direction for a verdict in its favor, the facts are thereby submitted to the court, whose findings in that respect are not subject to review, does not apply to the present case, for the following reasons: First, because, in resisting the motion for a directed verdict for plaintiffs, defendant's counsel argued that there were disputed questions of fact that should properly be decided by a jury. The record, however, does not disclose that this was the case. Second, that after the judge had determined to grant the plaintiffs' motion, defendant's counsel asked for a direction in its favor, on the ground that the evidence showed conclusively that plaintiffs' conduct was fraudulent and an estoppel as a question of law, without regard to the question whether plaintiffs actually intended to defraud.

We do not think the grounds stated are sufficient to take the case out of the rule as laid down in Beuttell v. Magone, 157 U. S. 154, 15 Sup. Ct. 566, 39 L. Ed. 654. At the conclusion of the evidence, as shown by the record, plaintiffs made a motion for a directed verdict in their favor. Immediately thereafter, defendant moved for such a verdict in its favor. After argument, pro and con, on the plaintiffs' motion, the court decided to grant the same. Thereupon the defendant asked leave to renew its motion. The court said that, having disposed of the first motion, it saw no use of hearing argument on the other. It finally, however, allowed the defendant's counsel to renew his motion for a direction of a verdict in its favor, and argue the same, which was done. Counsel thereupon argued that a verdict should be directed for the defendant on the following grounds: First, that the agreement by which the silk in question was delivered to the Silk Company was a chattel mortgage, and as such had not been recorded in compliance with either the laws of New York or New Jersey; second, that the evidence conclusively showed such fraud and secret understanding on the part of the plaintiffs as to

make the trust receipt void as to creditors, and an estoppel; ·and third, on the ground that, by the facts in evidence, the plaintiffs were estopped. After this contention on the part of the defendant, the court refused to direct a verdict for the defendant, and directed the verdict in favor of the plaintiffs, above referred to. The record does not disclose that any contention was made by the defendant that the case should be submitted to the jury upon the evidence. On the contrary, the contention of defendant's counsel was for a direction of a verdict in its favor, on the grounds above stated. We think, therefore, that all questions of fact and all matters of inference were conclusively decided against the defendant by the directed verdict. The application, however, of this rule is not necessary to the decision of this case.

A strong prima facie case, establishing the plaintiffs' title to the goods in question, was made by the documents above referred to and by the history of the transaction between the plaintiffs and the Silk Company, as disclosed by the evidence. From this evidence, it appears that the financing of such importations has for years constituted a regular part of the plaintiffs' business, and that this transaction was begun and carried through in the regular form. The papers used were filled up printed blanks, thereby showing the customary character of the transactions embodied therein, and that the method of procedure was the usual and customary one. There were no special agreements between the parties, and no arrangements or understandings of any kind, except those embodied in the papers mentioned. The plaintiffs were conducting a conservative foreign banking transaction in the usual and customary way, their compensation being a small commission of about 1¼ per cent., and amounting to less than $200 for a transaction extending over six months and for a liability of about $16,000, the smallness of the commission being due to the reliance placed upon the security afforded by title to the goods until this liability had been discharged.

The customary character of the transaction is attested, not only by the record before us, but by the judicial notice elicited in many modern cases more or less similar to the present one. We can readily understand how the business of foreign importation by merchants, and especially by manufacturers, is facilitated and enlarged by making available to those of small means the credit of banking capital. The business of importation is thus extended, by not being confined to those concerns having large capital and established foreign credit.

The exigencies of trade and commerce have caused many exceptions to be made to the rigid rule founded on the policy underlying the statute of frauds, by which the divorce of title from possession is declared either evidence of fraud or to be fraudulent per se. Accordingly, courts consistently recognize and protect the title of the real owner of goods placed by him in the hands of a bailee for a legitimate purpose, and will protect it, even where such bailee is clothed with all the indicia of ownership that physical possession can give, and undertakes, in violation of his contract, to dispose of the goods to an innocent purchaser. Cases of conditional sale and other

bailments, where title has never passed from the real owner and where the possession of the bailee is not inconsistent with the real contract between the parties, are familiar illustrations of the law in this regard. In the present case, there can be no doubt that the title to the goods in question passed from the original vendors to the plaintiffs for a well recognized and lawful purpose, viz., to secure the plaintiffs by the acquirement and retention of said title against failure on the part of the Silk Company to make good the acceptance by the plaintiffs of the purchase money draft at its maturity. Nor can it be seriously questioned that the plaintiffs could legally deliver possession of these goods to the manufacturer, for whose benefit the purchase had been made in Japan, without parting with the title to the same, and measurably retain the security intended to be given the plaintiffs by virtue of the original undertaking, provided always that the possession be consistent with the agreement between the parties for that purpose. The law has long been settled that such title and ownership will be recognized, so far as they are necessary to the security they were intended to give for the payment of the purchase money of the goods bailed, and this, although a dishonest bailee is thereby enabled, by violating his contract of bailment, to avail himself of such possession to represent the property as his own, and thus practice a fraud on third persons with whom he deals in respect thereto. But such cases are an exception to the ancient rule founded on the policy of the statute of frauds, touching the divorce of actual title and possession, the doctrine being, as held in New Jersey, that possession in one person, which is consistent with an agreement between the parties is not inconsistent with the actual title in another, which will be supported for the purposes stated in the contract. As said by the Supreme Court of New Jersey in Cole v. Berry, 42 N. J. Law, 308, 314 (36 Am. Rep. 511), in speaking of a conditional sale:

"Where the vendee is in possession under a conditional contract of sale, he has no property to convey to a purchaser, and the vendor's title never having been divested, he may reclaim the property if the condition be not performed, even as against a purchaser for value in good faith."

Many cases are cited by the courts in New Jersey and other states, in support of this doctrine, and in conclusion the court says:

"Possession is evidence of title, but is not title, and in this state" (New Jersey) "possession by a party, not in accordance with the actual state of the title, is not per se fraudulent."

There is no doubt at all that the understanding of the parties, as evidenced by what they did, the documents passing between them, the evident purpose of the transaction, and the well understood commercial custom above referred to, was that the title to the goods in question should pass from the vendor directly to the plaintiffs, and should there remain for his protection until the payment had been made for the invoices by the Silk Company. That this is the law of the contract we are here considering, is well stated by the Court of Appeals of the great commercial state of New York in the leading case of Moors v. Kidder et al., 106 N. Y. 32, 40, 12 N. E. 818. Re-

ferring to the earlier case of Farmers' & Mechanics' Nat. Bank v. Logan, 74 N. Y. 568, the court says:

"The doctrine stated was, in substance, that where a commercial correspondent, however set in motion by a principal for whom he acts, advances his own money or credit for the purchase of property and takes the bill of lading in his own name, looking to such property as the reliable and safe means of reimbursement up to the moment when the original principal shall pay the purchase price, he becomes the owner of the property, instead of its pledgee, and his relation to the original mover in the transaction is that of an owner under a contract to sell and deliver when the purchase price is paid. The authorities which sustain and the reasons which justify the doctrine need not be repeated, and it is required only that we determine whether it applies to and settles the case in hand."

In the case before us, the Silk Company, upon the procuring of the letter of credit authorizing Vivanti Bros. to draw upon the plaintiffs' correspondent in London, made an acknowledgment to the plaintiffs of the same and confirmed the terms of the letters of obligation, signed upon receiving a similar letter of credit in a former transaction. Some of the terms in this letter of obligation are much relied upon by the defendants. It speaks of "giving security," if required, for due fulfillment of the conditions of the undertaking and to pay, 12 days before maturity, the amount of acceptances in sterling bill, etc. They also say:

"And we hereby give you a specific claim and lien on all goods and the proceeds thereof, for which Direction der Disconto Gesellschaft may come under engagements under said credit."

This letter, however, was given at the very inception of the transaction, was a document of which the defendant had no knowledge, was long prior to the purchase of the goods and the acquirement of title by the plaintiffs under the stipulations of the letter of credit, and could in no way control or prescribe the manner in which plaintiffs determined to secure themselves in accordance with the general banking custom when they delivered the goods upon the contract of bailment described in the trust receipt. In the leading case of Moors v. Kidder to which we have above referred, Swain, on whose account the shellac was bought in Calcutta, agreed to provide funds in London to meet such bills as should be drawn, at their maturity, and that "all property which shall be purchased by means of the within credit * * * together with the bills of lading for the same, are hereby pledged and hypothecated to Messrs. Baring Bros. & Co." (being the principals for whom Kidder, Peabody & Co. were the agents) "as collateral security for the payment, as above promised." Upon the words "pledged and hypothecated" and "collateral security," the same argument was made as is made here, that the general property was conveyed to the person on whose account the purchase was made, the plaintiffs retaining only such security as could be given by the words "specific claim and lien" in the letter of obligation. Such security, of course, would not amount to a common law pledge, as the so-called lien would be unaccompanied by possession. The court, however, disposed of this contention by referring to the Logan Case,

supra, where the wheat was described as "pledged" to the plaintiff. The court then used this language:

"Here, then, we have a case where no title was attempted to be given to Swain, where it was given to the Barings by the bill of lading to them, where they paid for the property by their own credit and money, where it was the very pith of the adventure that the shellac should furnish the means of meeting the price, where the invoice was to be made to their order, where the possession was to be theirs, where they were to have the right of disposal at discretion, and Swain was to have no control until payment of the draft. In such a case he could not be general owner, and an inference to that effect from an inapt expression cannot be indulged."

Swain had received the bill of lading and invoice from the Barings, signing a receipt therefor explicitly specifying that they had been indorsed in blank to enable Swain to make entry and to warehouse the goods as agreed (i. e., to keep them in storage as the property of the Barings). Swain, however, entered the goods in the name of his broker and then pledged them to the plaintiff as security for a loan, the pledgee trusting to the representations of Swain and the warehouse receipt which he obtained. Notwithstanding that the plaintiff was an innocent party and that Swain had been enabled by the documents in question to deceive him as to his ownership of the goods, the court affirmed the judgment below, saying that no verdict in favor of the plaintiff would have been justified.

Where the real nature of the transaction upon which the banker's credit is advanced for the purchase of goods on another's account is apparent, courts will sustain the title and property of the banker as security for his advances, even where the goods have been allowed to go into the possession of the one upon whose account they were purchased, though no trust receipt, as in this case, or other document, specifically stated the agreement upon which they were so delivered. Such a case was that of Farmers' Bank v. Logan, supra, where there was no trust receipt or no letter of credit or letter of obligation, but upon the advances made by the bank and the nature of the transaction the court sustained the bank's title. So also in Merchants' Bank v. McGraw, 76 Fed. 930, 22 C. C. A. 622, there was no trust receipt. Plaintiff guaranteed a purchaser's draft for payment of certain goods, under agreement that it should have the goods' bill of lading and invoice as security. The goods were to be paid for before delivery, but they were placed in a depot and the bill of lading was issued in the purchaser's name. After the bill of lading issued and before payment of the draft, the goods were levied on under execution against the purchaser. It was held that the effect of the bill of lading, as prima facie evidence of title in the purchaser, was overcome by the facts which proved the intention that title should be in the guarantor, the Court of Appeals for the Ninth Circuit saying:

"Common honesty demands that agreements of this character made in good faith should be protected by the courts."

In the New Haven Wire Co. Cases, 57 Conn. 352, 18 Atl. 266, 5 L. R. A. 300, there was an agreement for a conditional sale, which in the absence of fraud was held valid by the Supreme Court of Er-

rors of Connecticut, as well against third persons as against the parties; and this, although the delivery was accompanied by permission to sell the property as that of the original vendor, and hold the proceeds for him. To the validity of such a transaction, said the court, it is only requisite that it shall be one of good faith and not a cover for a pledge. In the course of its opinion, the court said:

"The decisions are so numerous, and by so many courts, to the effect that when a commercial correspondent advances money for the purchase of property and takes possession, either actual or symbolical, he becomes the owner thereof, even when the advancement was made and the property was purchased at the request and for the ultimate use and profit of another, and there is an agreement to transfer title to that other upon the performance of conditions precedent, and ownership was taken solely for the protection of the advancement, that such may be said to be the established rule. * * * A contract of purchase and sale is within legal protection, although the vendee takes title merely for protection and agrees to resell upon the performance of conditions, if the transaction assumes that form in good faith."

The plenary protection afforded by this customary banker's title, where the goods have been delivered to the one on whose account they have been purchased under circumstances like those of the present case, has been often sustained by courts of the highest authority, as attested by the numerous cases cited by the defendant in error. The courts have not attempted to define exactly what the relation between the credit-lending banker and the merchant is, as to the goods. In the language of the court in Charavay v. York Silk Co. (C. C.) 170 Fed. 819:

"It is not necessary to find in the nomenclature of security relations a category in which to place this one. It is governed by the contract of the parties, and the contract will only be disturbed by courts for illegality."

[2] As the case at bar was an action of trover, and only the right to the possession of the goods could be determined, the defendant contends that it had a lien for its work done on other goods deposited by the Silk Company for that purpose at the commencement of the suit, and it relies upon an act of the Legislature of New Jersey "in relation to the lien of manufacturers, spinners and throwsters of cotton, woolen and silk goods." 3 Comp. Stats. of N. J. p. 3140, § 66. Section 1 of said act is as follows:

"That all persons or corporations engaged in the business of manufacturing, spinning or throwing cotton, wool or silk into yarn or other goods, shall be entitled to a lien upon the goods and property of others that may come into their possession for the purpose of being so manufactured, spun or thrown into yarn or other goods, for the amount of any account that may be due them from the owners of such cotton, wool or silk, by reason of any work and labor performed and materials furnished in or about the manufacturing, spinning or throwing of the same or other goods of such owner or owners."

The defendant contends that the plaintiffs' ownership was secret and fraudulent as to defendant, and that the plaintiffs are estopped by their conduct from denying that the Silk Company was owner of the goods within the act giving the defendant a lien. In support of this position, the only documentary evidence much relied upon is certain words in the trust receipt itself, in which the Silk Company

agree to hold the merchandise in storage as the property of plaintiffs and subject to their order, "with opportunity to sell the same for cash and in case of sale to pay over to them the proceeds as soon as received, to be held and applied by them against the acceptances," etc. It appears that this trust receipt was written upon printed blanks, some of which were intended for manufacturers and some for merchants dealing in silk or silk goods. It is testified that the clause in question was printed and intended to apply to a merchant and not to a manufacturer.

However this may be, we do not find that the authority to sell and account for the proceeds to the plaintiffs weakened or in any manner modified the character of the bailment. A number of cases are cited by the counsel for defendant in error, where conditional sales and bailments have been upheld, in which the conditional vendee or bailee had the right to sell, not only when it was stipulated that he must account for payment of the goods sold, but, when he had the right to "sell goods in the ordinary course of business." The latter unrestrained right to sell was upheld in the case of Bryant v. Swofford Bros., 214 U. S. 279, 29 Sup. Ct. 614, 53 L. Ed. 997. See, also, In re Pierce, 157 Fed. 755, 87 C. C. A. 537; Cole v. Mann, 62 N. Y. 1; Ford v. Williams, 24 N. Y. 359. These and other cases cited by counsel for defendant in error seem to establish the proposition that the authority to sell in the usual course of business, much less an authority to sell and account for the proceeds to the owner, does not destroy the title reserved to him.

But in the case before us, the question does not arise. The defendant here is claiming to retain the goods by virtue of a throwster's lien, not under the common law, but, created, as he claims, by the statute of New Jersey above referred to. This is the real defense insisted upon. As this is not a common law lien, but in derogation of the common law, the statute under which it is claimed must be construed strictly by its terms. In considering this statute of New Jersey, we are not helped by the citation of any decision of the courts of that state, touching its application to circumstances like those of the present case. Manifestly, however, the extension of the lien created by the statute to "other goods of such owner or owners" must be restricted to actual ownership, as distinguished from apparent ownership due to possession. It is not necessary to inquire what effect the statute may have upon a common law lien, but it would be an inequitable and violent construction of the statute to say that it conferred upon such a bailee as the Silk Company was in this case the right to subject the plaintiffs' goods to a lien, not only for the services performed upon them in increasing their value, but also to a lien for like services performed upon other goods deposited by the bailee in which plaintiffs had no interest. The contention of the defendant turns, then, upon the question which we have been discussing, viz., did the Silk Company have not only possession but the general title to and ownership of the silk in question? In view of the discussion already had, we think this question must be answered in the negative. Until the title originally and indisputably acquired by the plaintiffs

in the goods purchased on the faith of their letter of credit, and of the liability incurred by them under their acceptances had answered the purpose of securing them against the failure of the Silk Company to meet those acceptances under their contract in the premises, that title remained in them intact and was not impaired by the bailment to the Silk Company under the stipulations of the trust receipt. If the goods in question are to be subjected to the indebtedness due for work done upon "other goods of such owner or owners," they could only be so subjected in case the Silk Company was the owner not only of the goods here in question deposited with the defendant, but also of the "other goods," as to which the antecedent indebtedness arose. The claim for a lien for throwing these specific goods is not here in question, as tender was made by the plaintiffs for the amount of such claim and has been allowed for by the judgment appealed from.

The defendant, however, urges that, even if the documentary evidence, consisting of the letter of credit, the letter of obligation, the trust receipt, and such open conduct of the parties in conformity thereto by themselves, might serve to establish the title of the plaintiffs, nevertheless all the steps in this transaction, though on their face regular and legitimate for the purposes had in view, were but a mask for a secret and fraudulent understanding between the plaintiffs and the Silk Company, by which it was permitted to have such a possession and control that enabled it to deceive the defendant into believing that it was the real owner of the silk in question, and had the right to dispose of it as such. For establishing the existence of such an understanding, which it contends was a "tacit" one, defendant asserts that the plaintiffs had knowledge that the Silk Company was a manufacturing concern when defendant delivered to it the goods in question and took the trust receipt, and that therefore, although no expression was given to such understanding, either orally or in writing, it must have been contemplated that the goods were to be put in the course of manufacture and sale. A "tacit" understanding is somewhat elusive as a subject of proof. In this case it seems to us to rest simply upon the assertion of defendant that there must have been such an understanding as above stated. This assertion so grounded cannot be accepted as a sufficient basis for evading seriously the character of the transaction between the plaintiffs and the Silk Company. We do not find that the transfer of the bill of lading by the plaintiffs to the Silk Company served to clothe the Silk Company with a title contradicting that explicitly set forth and stated in the trust receipt, and, independently of that receipt, inherent in the character of the transaction between the parties. It is true, the indorsement of the bill of lading was a symbolical delivery of the goods. In this case, however, it cannot amount to more than the physical delivery of the goods themselves would have amounted to. It did not import anything more than a possessory title, even if it had been exhibited by the Silk Company to the defendant, which the defendant does not claim to have been the case. The only evidence relied upon in this regard is that of the stenographer of the defendant company,

who testified that early in March she had a conversation with the manager of the Silk Company, and asked him when the defendant could expect further stock from the company, and that upon going to his desk he replied that he had 30 bales of silk coming in and would give them 10 and probably a few more. She then asked him what time the silk could be expected, and he replied that they had the invoice and bill of lading in New York and would get it in about a week's time, as it was then on its way across the continent.

As we are of opinion that the exhibition of the bill of lading by the Silk Company to the defendant would not have served as a muniment of more than possessory title, much less can the mere reference to a bill of lading not then delivered have that effect. It is hardly necessary to add that where, under a contract, delivery of possession without transfer of title or ownership is consistent with the honest and legitimate purpose of the parties to the contract, and where the real owner is not estopped to assert his title, by conduct fraudulent or otherwise, his title cannot be divested by anything done by the one in possession in fraud of or inconsistent with such contract.

After a careful examination, we see nothing in the evidence in this case that shows any conduct or act on the part of the plaintiffs by which they would be estopped to assert their title and ownership to the goods in question, so far as the same would serve to protect them in respect to the liability incurred by them for the acceptances made in the purchase of such goods. To hold otherwise would be to strike down a bona fide and honest transaction of great commercial benefit and advantage and founded upon a well recognized custom by which banking credit is efficiently mobilized for manufacturers and importers of small means.

It only remains to say that we find no ground upon which we can hold that the transaction here in question was tantamount to a mortgage, equitable or otherwise.

The judgment of the court below is therefore affirmed.