### In re RICHHEIMER. †

### ARBUTHNOT v. CENTRAL TRUST CO. OF ILLINOIS.

(Circuit Court of Appeals, Seventh Circuit. January 23, 1915.)

Nos. 2121–2123.

**1. PLEDGES ☞11—PLEDGE DISTINGUISHED FROM OTHER TRANSACTIONS—"SECURITY TITLE."**

Certain bankers advanced the purchase price of coffee, imported by a Chicago merchant, under agreements for their security through the ownership of the coffee pending payment by the importer of such advances. The coffee, upon its arrival in New Orleans, was delivered by the bankers' agents, who under the agreement received the bills of lading, invoices, etc., to the importer, in exchange for trust receipts, whereby he agreed to hold the coffee in storage as the bankers' property, with the right to sell it and pay the proceeds to the bankers, until their advances were discharged; the receipts stating that it was the intention of the agreement to preserve unimpaired the ownership, or, in the case of one of the receipts, the lien, of the bankers. One of them specified that it was an agreement to hold the coffee in trust for the bankers and sell it for their account. Each receipt disclosed the bankers' title to be for security only, which would be divested at any stage on payment of the advances. The coffee was immediately forwarded by rail as consigned to its Chicago destination; the taking of the receipts and delivery to the importer at New Orleans effecting

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

† Writ of certiorari denied by Supreme Court.

no stoppage of the coffee there. All of the invoices, bills of lading, etc., coming to the hands of the bankers, indicated that the consignment was made for delivery to the importer at Chicago, subject to the arrangement for securing the bankers. The importer placed the coffee in warehouses in Chicago, receiving warehouse receipts therefor, part of which he negotiated to holders in good faith. *Held*, that the title of the bankers was a special form of "security title," apart from any common-law form of security, arising out of modern conditions of trade and commerce, and not dependent upon possession as in the case of a common-law pledge or mortgage.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 28–35; Dec. Dig. ⚖⇒11.]

2. COURTS ⚖⇒372—UNITED STATES COURTS—STATE LAWS AS RULES OF DECISION.

The effect and validity of the bankers' title, when sought to be enforced in the federal courts, were not, as claimed, governed by the general commercial law, apart from the local law, but were subject to the local law, as the ownership and transfer of, and liens upon, personal property which has come within a state are subject to and controlled by the policy adopted by such state, for the regulation and control thereof, and whoever sends property to a state impliedly submits to the regulations concerning its transfer in force there, though a different rule of transfer prevails in the jurisdiction where he resides.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 977–979; Dec. Dig. ⚖⇒372.

State laws as rules of decision in federal court, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

3. PLEDGES ⚖⇒2—EFFECT AND VALIDITY—LAW GOVERNING.

The effect and validity of the bankers' title was governed by the laws of Illinois, and not by those of Louisiana, notwithstanding the delivery to the importer at New Orleans.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 2; Dec. Dig. ⚖⇒2.]

4. BANKRUPTCY ⚖⇒172—PROPERTY PASSING TO TRUSTEE—SECRET LIENS AND RESERVATIONS OF TITLE.

Under the rule and policy of Illinois, that possession is one of the strongest evidences of title to personal property and cannot be rightfully separated from the title, except in the manner pointed out by statute, and that without notice to the world the real ownership cannot be in one person and the ostensible ownership in another, and under Hurd's Rev. St. Ill. 1913, c. 95, § 1, providing that no mortgage, trust deed, or other conveyance of personal property having the effect of a mortgage or lien, shall be valid as against third persons, unless possession shall be delivered to and remain with the grantee, or unless the instrument shall provide for the possession to remain with the grantor and the instrument shall be acknowledged and recorded, and Bankr. Act July 1, 1898, c. 541, § 47a (2), 30 Stat. 557, as amended by Act June 25, 1910, c. 412, § 8 (Comp. St. 1913, § 9631), providing that the trustee as to all property in the custody of the bankruptcy court shall be deemed vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings, and as to property not in the custody of the bankruptcy court with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied, the title of the bankers could not prevail against the importer's trustee in bankruptcy as to the coffee not covered by negotiated warehouse receipts.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 220; Dec. Dig. ⚖⇒172.]

5. WAREHOUSEMEN ⚖⇒15—WAREHOUSE RECEIPTS—RIGHTS OF HOLDERS.

Under Hurd's Rev. St. Ill. 1913, c. 95, § 1, and Negotiable Warehouse Receipt Act, §§ 25, 40, 41, 47, 49 (Hurd's Rev. St. Ill. 1913, c. 114, §§ 265,

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
221 F.—2

266, 281, 287, 289), relative to property delivered to a warehouseman by the owner or by a person whose conveyance to a purchaser in good faith for value would bind the owner, and to the negotiation of warehouse receipts, the rights of the holder thereof, the validity of the negotiation, though in breach of a duty, and the invalidity of a seller's lien or right of stoppage in transitu as against the holder of a negotiable receipt, the title of such bankers to such of the coffee as was covered by the negotiated warehouse receipts was invalid as against the holders of such receipts.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 31–34, 37; Dec. Dig. ☞15.]

Appeals from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Ferdinand A. Geiger, Judge.

In the matter of Isaac D. Richheimer, trading as Richheimer & Co., bankrupt, of which the Central Trust Company of Illinois was appointed receiver and trustee. On petitions to establish the ownership of property, orders were made in favor of the Commercial National Bank of Cedar Rapids and others, the German-American Savings Bank, and the Central National Bank of Peoria, which filed answers, treated as cross-petitions, and the petitioners, Charles George Arbuthnot and others, A. H. O. Dennistoun and others, and Arthur Henry Brandt and others, respectively, appeal. Affirmed.

These three appeals are brought from several orders of the District Court in bankruptcy in the above-entitled matter against the appellants, respectively, upon their several petitions filed to establish ownership in petitioners of importations of coffee, received by the bankrupt and stored by him in public warehouses at Chicago, and so held on warehouse receipts issued to the bankrupt. The transactions in controversy are thus described by Judge Geiger, in connection with his opinion filed on the hearing below:

"The bankrupt was a coffee merchant in Chicago. Dennistoun, Cross & Co., Arbuthnot, Latham & Co., Arthur H. Brandt & Co., London bankers (and the latter designation will, for brevity, be given them), have petitioned the court for an adjudication of their title, ownership, and right to the possession of certain coffee imported by the bankrupt, and alleged to have come to the bankrupt estate herein. The Continental & Commercial National Bank of Chicago and other banks (which for brevity will be designated as the American bankers) have filed what have been treated as cross-petitions, seeking to defeat the claims of the London bankers, and also to establish their own title to the coffee, by virtue of the transactions to be hereafter detailed. The trustee in bankruptcy makes no claim to the property, averring, in its answers to the London bankers' petition, its concurrence in the claims asserted by the American bankers. The facts are not seriously in dispute. There are some differences in the agreements entered into by the London bankers in the transactions upon which their claims rest, but not such as alter the legal aspect of their respective situations. The coffee in question was purchased and was the subject of importation by the bankrupt, from Brazilian growers or dealers. The several purchases were effected through the medium of brokers—the transactions being evidenced by brokers' notes executed and delivered by the brokers on behalf of the Brazilian growers, and delivered to the bankrupt or his agents; such notes evidencing, according to the custom of the trade, the details of the purchase, such as quantity, quality, description of, and the price to be paid for the coffee, and calling for approved credit to be furnished upon the sales. The mode of procedure was thereupon substantially this:

"Application for credit was made to the representatives of the petitioning London bankers. There was thereupon issued to the bankrupt, and in favor of the Brazilian vendors, a letter expressive of the terms of credit. For the purpose of indicating more clearly the situation, a copy of one of such letters issued by the petitioning bankers, Dennistoun, Cross & Co., is set forth:

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**" '(A)**

" 'No. W/5460 for £1065-0-0.                New Orleans, April 15th, 1912.

" 'Messrs. Nossack & Co., Santos—Sir: We hereby open a credit in your favor for one thousand and sixty-five pounds sterling to be used by your drafts on us at ninety days' sight for the purchase of 250 bags of coffee to be shipped to New Orleans for account of Messrs. Richheimer & Co., Chicago, Ill. And we agree with yourselves as drawers and with the indorsers and bona fide holders respectively of your drafts to accept the same drawn as aforesaid on receipt of due advice, and of bill of lading (original and duplicate advice to be accompanied by one bill of lading each), together with abstract of invoice. The other bills of lading and consular invoice to be sent direct to Messrs. Westfeldt Bros., New Orleans. The bills of lading are to be made out to "order" and indorsed in blank to you. And the negotiator will please indorse the amount of each draft on this credit. To be shipped per steamship Sallust. The marine insurance on the shipments hereunder is cared for. This credit is to be in force in Santos until July 15, 1912. Please fill up drafts as follows: "Against your letter of credit" No. W/5460, dated New Orleans, April 15, 1912.

" 'We are, sir, your most obedient servants,
                        " 'Dennistoun, Cross & Co. of London,
                           " 'By their Agents in New Orleans,
                                 " 'Westfeldt Brothers.'

"Attached to and forming a part of such letter of credit is a memorandum as follows:

" 'Received the letter of credit of which the annexed is a copy, for one thousand and sixty-five pounds sterling, in consideration whereof we hereby agree with Messrs. Dennistoun, Cross & Co., of London, to provide, previous to the maturity of the bills drawn in virtue of said credit, sufficient funds in cash, or in satisfactory bills on London, at not exceeding sixty days sight, indorsed by us, to meet the payment of the same, together with their commission. It is understood that moneys paid to Messrs. Westfeldt Bros., New Orleans, shall be taken as a payment without recourse, and that in all settlements arising under this credit the pound sterling shall be calculated at the current rate of exchange at the time of such settlement. It is further understood that each draft is to be settled to a point, with commission as above, and interest adjusted in a net rate of exchange at the time of payment. In the event, however, of settlement not being made to a point, then Messrs. Dennistoun, Cross & Co. are to furnish their account current semiannually, charging interest at the rate of five per cent. per annum, or at the current rate if it be above that.

" 'And we hereby recognize and admit the ownership of Messrs. Dennistoun, Cross & Co. in, and their right to the possession and disposal of, all goods, and the proceeds thereof, for which Messrs. Dennistoun, Cross & Co. may come under any engagements in virtue of this credit, as also to the possession of all bills of lading for and policies of insurance on such goods, until such time as any indebtedness or liability existing as against us in favor of Messrs. Dennistoun, Cross & Co., under the said credit or otherwise, shall have been fully paid up and discharged. In the event of their hereafter intrusting through the agency of Messrs. Westfeldt Bros., or otherwise, said goods to us for the purpose of sale or otherwise, we hereby consent that their right to repossess themselves of the same, or any proceeds thereof may be exercised at their discretion. Any proceeds of said goods coming into Messrs. Dennistoun, Cross & Co.'s hands are to be applied against their acceptances under this credit, or against any other indebtedness of ours to them, including all expenses incurred by them, and commissions of sale and guaranty.

" 'It is understood and agreed between Messrs. Dennistoun, Cross & Co. and us that Nossack & Co., the parties authorized to draw bills under said credit, are in all respects to be regarded as our agents, and that neither Messrs. Dennistoun, Cross & Co., nor Messrs. Westfeldt Bros., are to be under any responsibility to us in respect to the bills of lading or other documents which are required to accompany the bills drawn, nor shall any fraud or error in, or nonconformity or deficiency of, bills of lading or other documents, nor any question as to their genuineness, be any defense against our obliga-

tion for reimbursement in respect of bills actually drawn by the party designated for drawing bills under said credit. The marine insurance to be done by ......; Messrs. Dennistoun, Cross & Co.'s charge for commission to be ½ per cent. on the amount used. All securities which shall be received by Messrs. Dennistoun, Cross & Co. hereunder may be held and applied by them also to secure all other indebtedness or liability existing or which may hereafter arise from us to them.

"'This obligation to continue in force and to apply to all transactions, notwithstanding any change in the individuals composing the respective firms, parties to or concerned in this contract, or either of them, or in that of the user of this credit, whether such change shall arise from the accession of one or more new partners, or from the death or accession of any partner or partners.                                                                        Richheimer & Co.

"'Chicago, Ill. April 18, 1913.'

"Pursuant to the transactions thus evidenced, the shipments of coffee were made, and the drafts called for by the letter of credit issued. Upon its arrival at New Orleans, the coffee was delivered to the bankrupt, who executed and delivered to the representatives of the petitioning bankers a memorandum as follows:

"'Received from Messrs. Westfeldt Bros., of New Orleans, Messrs. Dennistoun, Cross & Co.'s merchandise specified in the bill of lading, per S. S. Sallust, RCC/A—250 B/coffee, Nossack & Co., shipper, in consideration of which we agree to hold the same on storage as Messrs. Dennistoun, Cross & Co.'s property (with liberty to sell the same, and on such sale to pay over or deliver the proceeds to Messrs. Westfeldt Bros.), until the bills of exchange drawn on Messrs. Dennistoun, Cross & Co., of London, for the purchase money of the said goods, shall have been remitted for by us or satisfactorily provided for by us, and to keep the said property insured against fire and free from incumbrance; the intention of this undertaking being to protect and preserve unimpaired the ownership of Messrs. Dennistoun, Cross & Co. in the said property.                                                              Richheimer & Co.'

"As indicated, there are certain differences in the memoranda executed by the bankrupt to the petitioning London bankers, upon receipt of the property by the bankrupt; that issued to Arthur H. Brandt & Co., being as follows:

"'L3163–8–6                                          Due in New York Aug. 23, 1912.

"'Trust Receipt.

"'Received from Messrs. Arthur H. Brandt & Co., of London, through their agents in New York, Messrs. Wessels, Kulenkampff & Co., the following goods and merchandise, their property specified in the bill of lading per Sallust, dated April 25th, marked and numbered as follows: "Barbosa R. & C E 1 750 Bags Coffee," and in consideration thereof we hereby agree to hold said goods in trust for Messrs. Arthur H. Brandt & Co., and as their property, with liberty to sell the same for their account, or to manufacture and remanufacture the same without cost or expense to them, and we also agree to keep said goods and the manufactured produce and proceeds thereof, whether in the form of money or bills receivable, separate and capable of identification as their property, and to hand the proceeds to Messrs. Wessels, Kulenkampff & Co. to apply against the acceptances of Messrs. Arthur H. Brandt & Co., London, for our account, under the terms of letter of credit No. 535, issued for our account, and for the payment of any other indebtedness of ours to Messrs. Arthur H. Brandt & Co., London, or Wessels, Kulenkampff & Co., New York. Messrs. Arthur H. Brandt & Co., or Wessels, Kulenkampff & Co., may at any time cancel this trust and take possession of said goods or the manufactured product, or of the proceeds of such of the same as may have been sold, wherever the said goods or proceeds may then be found, and in the event of any suspension, proceedings in bankruptcy, or failure, or assignment for benefit of creditors, on our part, or the nonfulfillment of any obligation, or of the nonpayment at maturity of any acceptance made by us under said credit, or under any other credit issued by Messrs. Wessels, Kulenkampff & Co. on our account, or of any indebtedness on our part to them, or to Messrs. Arthur H. Brandt & Co., all obligations, acceptances, indebtedness, and liabilities whatsoever shall thereupon (with or without notice) at their option mature

and become due and payable. The said goods and manufactured produce thereof while in our hands shall be fully insured against loss by fire by policies satisfactory to Messrs. Arthur H. Brandt & Co. or Wessels, Kulenkampff & Co., and the insurance money received for any loss shall be subject to the trust herein contained in the same manner as the goods themselves; the intention of this agreement being to protect and preserve unimpaired the ownership of Messrs. Arthur H. Brandt & Co. and their agents, Messrs. Wessels, Kulenkampff & Co., in said goods, their product and proceeds.

"'Dated June 15, 1912. Richheimer & Co.'

"It will be observed that the receipt or memorandum, executed by the bankrupt as last above noted, indicated the marks of identification found on the various bags containing the coffee. These marks are testified to by witnesses as indicating Richheimer & Co., the bankrupt, to be the intended ultimate recipient thereof. Upon arrival and delivery of the coffee to the bankrupt, the latter caused the same to be transferred to Chicago, and there placed in public storage warehouses; the warehouse receipts issued against the same being delivered to him. He thereupon executed his negotiable promissory notes, payable to the order of Frank G. Wright & Co., note brokers, and delivered the same to the latter, with the several warehouse receipts as collateral thereto. Wright & Co. thereupon sold the notes to the various petitioning American bankers, who now hold them, together with the warehouse receipts issued as stated, and by virtue thereof claim a superior right to the coffee in question."

John M. Zane and Timothy J. Scofield, both of Chicago, Ill., for appellant.

Isaac H. Mayer, of Chicago, Ill., for appellees.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above). The transactions involved in these three appeals are several importations of coffee by the bankrupt from Brazil, on which the appellants respectively (London bankers) had advanced the purchase price, under provisions made for security of the appellants, through ownership of the goods, pending payment by the bankrupt of such advances. On arrival in Chicago, as consigned, the bankrupt received and stored the imported goods in public warehouses, taking the customary warehouse receipts therefor in his own name. The controversy arises out of negotiations by the bankrupt of these warehouse receipts—excepting one minor lot of coffee not included therein—to certain of the appellees, hereinafter referred to as "American bankers," who claimed ownership respectively of the coffee embraced in such negotiable receipts, and were so awarded ownership by the decree of the District Court. Paramount title, however, is asserted on behalf of the appellants under the provisions referred to for security of their advances, all of which are unpaid. The legal status, therefore, of these conflicting claims presents the main question, if not the only one, for decision. All material facts in the transactions are undisputed, and the entire bona fides thereof on the part of both London bankers and American bankers is expressly conceded; and no question of unlawful preference arises in any branch of the case.

[1] The argument in support of the appellants' claim as paramount is directed to several propositions of the nature and validity of title vested in the appellants, under the doctrine generally upheld in transactions of like character, which may be summarized as follows: (a) That they "had title to the coffees and immediate right to possession"

when bankruptcy occurred; (b) that they were "unquestionably the owners of the bills of lading and of the goods covered" thereby; (c) that such title was made continuous and valid under the bankrupt's trust receipt in evidence; (d) that, even if treated as a pledge, no release thereof was effected by delivery under the trust receipt, and "the appellants are pledgees superior in right"; (e) that they are not conditional vendors, nor subject to the Illinois law applicable to such relation; (f) that their title is not that of mortgagees, nor affected by the Illinois Chattel Mortgage Act (Hurd's Rev. St. 1913, c. 95, §§ 1–21); (g) that the bankrupt's possession was that of "a bailee for sale," and he could confer no property rights "as against the appellants"; (h) that the "appellants are not estopped by any of the matters" offered in evidence; (i) and that their rights are unaffected by the Illinois Warehouse Receipt Act.

We believe the authorities, federal and state, substantially concur in upholding the validity of transactions of like nature in the financing of importations, wherein (as stated in Century Throwing Co. v. Muller, 197 Fed. 252, 258, 116 C. C. A. 614, 620) the advances are made by the foreign banker in reliance "upon the security afforded by title to the goods until this liability had been discharged." The cases are not harmonious in definitions of the nature of such title held by the banker, but we understand them to concur in its recognition as a special form of "security title," both needful and well established in the importation of goods, entitled to the utmost of judicial protection for enforcement, not only as against the importer, but against bona fide claimants under him. Each of these precedents is necessarily governed, for interpretation and validity, by the particular facts there presented, but their consensus of ruling upon the character of the security (as above stated) must be observed in so far as applicable to the case at bar.

In Judge Geiger's opinion, filed on the hearing of these claims, the facts are reviewed and discussed in the light of the leading authorities, with clearness and discrimination, to ascertain the nature of security thus obtained in favor of the appellants. As aptly pointed out therein, in substance: This "security title" of the bankers cannot have the force of an unqualified ownership of the goods, with complete right of disposition irrespective of the importer's interest. The exporters having "relinquished the whole of their interest" on transmission of the bills of lading to the bankers, the title acquired by the bankers for security must leave a "residue of ownership" of some character in the importer under the contract of purchase and consignment of the goods. The conclusions are thereupon stated in the opinion that the relation created between the bankers and the importer was not that of vendor and vendee of the coffees, but that the bankers' security title was "analogous to that of pledgee or mortgagee," wherein possession "was of the essence of their rights," and that surrender of such possession, under the so-called trust receipts in evidence, gave the importer dominion over the property which was destructive of the bankers' security as against the claims of the appellees (American bankers). Such conclusions, however, are not made the sole basis of the decrees in favor of the appellees, as the opinion further holds the Illinois Ware-

house Receipt Act (hereinafter considered) operative to that end, what-ever view be adopted as to the nature of the security title.

We believe the above-stated premises for definition of the title to be well founded, but do not understand them to authorize its classification either as a pledge or mortgage of the property, nor as requiring possession to be of the essence of the right. Its nature as exemplified in the authorities is apart from the common-law forms of security, as we believe, arising out of modern conditions of trade and commerce, which have caused "exceptions to be made to the rigid rule founded on the policy underlying the statute of frauds, by which the divorce of title from possession is declared either evidence of fraud or to be fraudulent per se" (Century Throwing Co. v. Muller, supra), so that it may not be definable within any form of security thus founded. Without attempting review of the long line of cases called to our attention, we are satisfied that the well-considered opinion in Century Throwing Co. v. Muller, supra, speaking for the Circuit Court of Appeals of the Third Circuit, presents both sufficient review thereof and clear exposition of this modern form of "security title" and of the general rule for upholding its validity. Concurrence, however, in such view of its validity under the general rule is far from decisive of the present controversy. It involves, nevertheless, the ultimate issues: (1) Whether the security provisions are subject to the laws of Illinois; and, if so, (2) what is their effect upon the claims in suit?

[2, 3] 1. Undoubtedly transactions of the nature above described are subject to statutory regulation and control, when brought within the cognizance of state legislation, and the general rule referred to cannot override rules of public policy thus adopted, if applicable to the state of facts in evidence. So the primary inquiry arises: Are the transactions thus brought within the scope of the Illinois enactments? For denial of their force, however interpreted, we understand the appellants' contentions are in substance: First, that the effect and validity of the appellants' claims are questions of general commercial law, not subject to local law for enforcement of the security in the federal courts; and, second, on the assumption of subjection to local law, delivery of the goods occurred in New Orleans under the trust receipts in evidence, and the transactions are governed by the law of Louisiana, and not that of Illinois.

We believe the first-mentioned contention must be set aside, under the uniform line of federal decisions which have settled this doctrine: (a) That ownership and transfer of and liens upon personal property which has come within the state are subject to and controlled by the policy adopted by the state for regulation and control thereof; and (b) that "whoever sends property to it impliedly submits to the regulations concerning its transfer in force there, although a different rule of transfer prevails in the jurisdiction where he resides." Hervey v. R. I. Locomotive Works, 93 U. S. 664, 671 (23 L. Ed. 1003); Pullman's Car Co. v. Pennsylvania, 141 U. S. 18, 22, 11 Sup. Ct. 876, 35 L. Ed. 613; Dooley v. Pease, 180 U. S. 126, 128, 21 Sup. Ct. 329, 45 L. Ed. 457; 8 Rose's Notes U. S. R. 1029; Id., 1 Supp. 1229, and 4 Supp. 774. The well-known case of Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865, is cited as lending support to the appellants' contention, but its doctrine

is plainly without force in the present inquiry. The other citations are Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359, and Kuhn v. Fairmont Coal Co., 215 U. S. 349, 30 Sup. Ct. 140, 54 L. Ed. 228, but in each of these cases the above-stated rule of state control over property rights is expressly recognized as binding all rights which have accrued under the settled law of the state. Their rulings are directed alone, as we believe, to independent determination of rights which had not been so settled as the state rule or policy when they accrued. Neither of these cases, therefore, tends to support the first contention, nor enters into consideration if the pre-existing law of Illinois is both applicable and decisive.

The further contention, that delivery of the goods at New Orleans renders the security subject to the law of Louisiana, and not that of Illinois, we believe to be equally untenable under the undisputed facts in evidence. The importer's sole place of business was in Chicago, and the purchases and all arrangements with the London bankers for financing the importations were made through correspondence on his part from Chicago. Each consignment was made for delivery to the importer at Chicago, subject to the arrangement for securing the bankers (appellants) for their advances, with such purpose and address exhibited in all the documentary evidence—in the invoices, bills of lading, letters of credit and drafts coming to the hands of the bankers. While New Orleans was the port of entry for the steamers in the course of shipment, the goods were immediately forwarded by rail (as consigned) to their Chicago destination. The so-called trust receipts taken up and deliveries made to the importer en route on arrival at New Orleans—although of undeniable force as proof of possession and rights thereby vested in the importer—neither intended nor effected stoppage of the goods there, but merely accomplished their forwarding as above designated, in conformity with the object of the transactions. Deliveries were there made by the personal agents of the bankers on receipts of the importer made and dated in Chicago, forwarded to such agent.

We are advised of no statute of Louisiana which even purports to reach these transactions, and believe it to be unmistakable that no ground is afforded by the above-mentioned deliveries at New Orleans to render them amenable to any general rule or policy of Louisiana respecting transfer of or liens upon personal property within the cognizance of the state; and the discussions in the argument of counsel thereupon are beside the inquiry involved herein. The several importations arrived at their Chicago destination in due course, and were there stored by the importer in a public warehouse, so that we are of opinion that all claims of interest therein in controversy are subject to the law of Illinois affecting their force and validity within the established doctrine above stated.

[4, 5] 2. Primarily the statutory rule and policy of Illinois has long been settled in favor of possession as "one of the strongest evidences of title to" personal property, which "cannot be rightfully separated from the title, except in the manner pointed out by statute," and will not "suffer without notice to the world the real ownership to be in one person and the ostensible ownership in another," as giving "a false

credit to the latter" and thus open to "injury to third persons." Hervey v. R. I. Locomotive Works, supra. In Harkness v. Russell, 118 U. S. 663, 678. 7 Sup. Ct. 51, 30 L. Ed. 285, the opinion of the court by Mr. Justice Bradley reviews the decisions thereunder as settling "a rule of property in Illinois" which must be observed there, and marks its distinction from the rule of many other states reviewed therein which had adopted a different policy, under which its rigid doctrine was inapplicable. So, in Dooley v. Pease, 180 U. S. 126, 21 Sup. Ct. 329, 45 L. Ed. 457, and Rock Island Plow Co. v. Reardon, 222 U. S. 354, 362, 32 Sup. Ct. 164, 56 L. Ed. 231, decisions of this court in Illinois cases, in conformity with the above stated rule, are affirmed on review of the authorities.

The fundamental provision on which these rulings rest is preserved in section 1, c. 95, Hurd's Stat. Ill. 1913, as follows:

"That no mortgage, trust deed or other conveyance of personal property having the effect of a mortgage or lien upon such property, shall be valid as against the rights and interest of any third person, unless possession thereof shall be delivered to and remain with the grantee, or the instrument shall provide for the possession of the property to remain with the grantor, and the instrument is acknowledged and recorded as hereinafter directed; and every such instrument shall, for the purposes of this act, be deemed a chattel mortgage."

In the light of the foregoing references review of the Illinois decisions is unnecessary, but it may well be remarked that none is cited which departs from the above stated interpretation of this statute. For special applications to the claims in controversy, however, the later provisions adopted in Illinois in 1907, known as the "Negotiable Warehouse Receipt Act" (Hurd's Stat. 1913, c. 114, arts. 241–300), are deemed decisive against the appellants' so-called "security title," under the trust receipts in evidence. These receipts differ in form, but we believe them to be of like effect in substance. In two of them the importer expressly agrees "to hold the same in storage" as the bankers' property, and such understanding must be implied from the other receipt under the undisputed custom in evidence. Each expressly provides for right of sale by the importer, the proceeds thereof to be paid over to the bankers until their advances are discharged; and two of them state the intention of the agreement "to preserve unimpaired the ownership" of the banker, while the third states the intention "to preserve unimpaired the lien." One of them specifies his agreement "to hold said goods in trust" for the banker and "to sell the same for their account." Each receipt discloses the appellants' title to be for security only, which would be divested at any stage on payment of the advances.

The above-mentioned statute (see, also, 5 Ill. Stat. Ann. J. & A. 5355, etc.) appears to be in the general form adopted in various states, referred to as "Uniform Negotiable Warehouse Receipt Acts." It is deemed sufficient to quote the following sections:

"Sec. 25. If goods are delivered to a warehouseman by the owner or by a person whose act in conveying the title to them to a purchaser in good faith for value would bind the owner, and a negotiable receipt is issued for them, they cannot thereafter, while in the possession of the warehouseman, be attached by garnishment or otherwise, or be levied upon under an execution,

unless the receipt be first surrendered to the warehouseman, or its negotiation enjoined. The warehouseman shall in no case be compelled to deliver up the actual possession of the goods until the receipt is surrendered to him or impounded by the court."

"Sec. 40. A negotiable receipt may be negotiated—(a) By the owner thereof, or (b) by any person to whom the possession or custody of the receipt has been intrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been intrusted, or if at the time of such intrusting the receipt is in such form that it may be negotiated by delivery.

"Sec. 41. A person to whom a negotiable receipt has been duly negotiated acquires thereby—(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value; and (b) the direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him."

"Sec. 47. The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was induced by fraud, mistake or duress to intrust the possession or custody of the receipt to such person, if the person to whom the receipt was negotiated, or a person to whom the receipt was subsequently negotiated, paid value therefor, without notice of the breach of duty, or fraud, mistake or duress."

"Sec. 49. Where a negotiable receipt has been issued for goods, no seller's lien or right of stoppage in transitu shall defeat the rights of any purchaser for value in good faith to whom such receipt has been negotiated, whether such negotiation be prior or subsequent to the notification to the warehouseman who issued such receipt of the seller's claim to a lien or right of stoppage in transitu. Nor shall the warehouseman be obliged to deliver or justified in delivering the goods to an unpaid seller unless the receipt is first surrendered for cancellation."

These provisions clearly denounce, as we belive, the security title set up in favor of the appellants, both in conformity with the pre-existing state policy as above defined and in terms which leave no room for doubt of applicability thereto. The breach of duty on the part of the importer (bankrupt) in "making the negotiation" of the warehouse receipt (section 47) cannot aid their claim, as the power was unquestionably vested in him to convey title to the goods "to a purchaser in good faith for value" which "would bind the owner" of goods so "delivered to a warehouseman" (sections 25, 41, 49). Thus vested, through the transactions in evidence as an entirety, with possession and authority to sell, either in parcels or in whole, we do not understand it to be open to question under these sections, whether consent was given to the storage. The undisputed circumstances, as we believe, afford no support for the contention that the transactions made the importer a mere factor, agent or bailee for sale of the goods. His interest as purchaser, although subjected to the security title, appears throughout and leaves no room for definition otherwise under the Illinois rule and policy.

For interpretation of the above-mentioned sections 40, 41 and 47, counsel for appellants cites the case reported as In re Dreuil & Co. (D. C.) 205 Fed. 568—affirmed by the Circuit Court of Appeals for the Fifth Circuit, 211 Fed. 337, 128 C. C. A. 16—in reference to like provisions in a statute of Louisiana. But the facts involved in that

case are plainly distinguishable from those presented here, and we believe the rulings therein to have no bearing upon the applicability of the statute as above stated.

Warehouse receipts were taken out and negotiated for value as we understand the record, for all the importations except as to seven bags of coffee. Under the provisions of the Warehouse Receipt Act, as thus interpreted, the decrees of the District Court must be affirmed accordingly in respect of all receipts so negotiated.

The portions of coffee not covered by such receipts were decreed to belong to the trustee. We believe the ruling in respect thereof was not erroneous, and may rightly be upheld under the general doctrine above defined against secret liens and reservations of title. The trustee is vested with right to such award pursuant to section 47a (2) of the Bankruptcy Act, as amended in 1910, as ruled by this court. In re Gold, 210 Fed. 410, 127 C. C. A. 142.

The several decrees of the District Court are therefore affirmed.