## OLD COLONY TRUST CO. v. SUGARLAND INDUSTRIES.

(District Court, S. D. Texas, at Houston. February 4, 1924.)

No. 148.

1. Factors ⟊47(2)—Banker's trust certificates issued by refiner against sugar shipments received did not create relation of principal and factor as respects right to factor's lien.

Defendant, a sugar refiner, contracted to receive from a second party shipments of raw sugar aggregating a stated quantity, to make advances on and refine the same, and to account to the shipper for the proceeds of the refined sugar after deducting its advances and charges. After shipments had been received and some of them treated, defendant executed to complainant bank, which had also made advances to the shipper, trust certificates, each covering a single shipment, acknowledging its receipt from complainant and agreeing after it was refined and sold "to hand over the proceeds of such sale, after deducting advances made by us and our charges for refining and handling in accord with the contract" between defendant and the shipper. In a suit by complainant for an accounting, it appeared that there was a surplus on some shipments after deducting advances and charges and on others a deficiency, and that on the aggregate there was a large deficiency due defendant from the shipper. Held, that the certificates did not create a relation

⟊For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
296 F.—9

of principal and factor between complainant and defendant which gave defendant a factor's general lien on the shipments in the aggregate, with the right to set off a deficiency on one shipment against a surplus on another, but that each certificate was a separate contract creating a banker's lien, with the right to a separate accounting in which complainant was entitled to recover the surplus, if any, arising on that particular shipment to the amount of its advances thereon but no more.

2. **Factors** ⊙47(2)—**Right to lien determined by contract.**

The general lien of a factor arising by implication out of the relationship does not exist where contrary to the terms of an express contract.

In Equity. Suit by the Old Colony Trust Company against the Sugarland Industries. Decree for complainant.

Alex S. Coke and Coke & Coke, all of Dallas, Tex., and Samuel Pillsbury and Pillsbury & Dana, all of Boston, Mass., for plaintiff.

H. M. Garwood and Baker, Botts, Parker & Garwood, all of Houston, Tex., and F. A. Williams and Williams & Neethe, all of Galveston, Tex., for defendant.

HUTCHESON, District Judge. [1] Plaintiff, Old Colony Trust Company, brings this suit for an accounting against the Sugarland Industries, and alleges that it was the owner and in possession of the following separate lots of sugar, to wit, on the steamship Olinda 16,375 bags, on the steamship Tustan 7,500 bags, on the steamship Lake. Dancy 2,000 bags, on the steamship Lake Dancy 20,000 bags, on the steamship Tustan 10,800 bags, on the steamship J. S. Whitney 4,000 bags, on the steamship J. S. Whitney 1,500 bags, on the steamship Corcoran 23,434 bags, and at different times delivered possession of such sugars in separate lots to the defendant, the Sugarland Industries; that this title accrued and was evidenced by certain so-called "trust receipts," each of date July 23, 1920; that from time to time defendant had paid certain sums of money on account of these sugars, and that from time to time defendant had made sales of the sugars which netted in amount largely in excess of what the defendant under the terms of these so-called trust receipts could properly charge against them, and that upon a proper accounting of the proceeds of the sale of the sugars it would be found that there was due plaintiff an amount in excess of $725,000. An accounting is prayed, and upon such accounting judgment for such sum as may be found to be due plaintiff.

Defendant answers that it had long prior to the execution and delivery of these so-called trust receipts acquired title and possession of these sugars under and by virtue of a certain contract entered into on the 10th day of March, 1920, by and between E. R. Sherburne Company, and W. T. Eldridge and S. E. Kempner, which contract was duly assigned to defendant.

Under this contract E. R. Sherburne Company contracted to furnish f. o. b. cars at Sugarland, Tex., cost, duty, and all transportation and insurance paid, 300,000 bags of sugar. That is to say, 50,000 bags monthly for six months. first delivery of at least 15,000 bags to be available at Sugarland about May 15th, and deliveries to be continuous and for such quantities to provide for the steady operation of the

refinery, commencing about June 1, 1920, through the months of June to November, both inclusive, making a total of 300,000 bags of raw sugar; these raw sugars to be billed by E. R. Sherburne Company to the refinery at market price date of arrival at Galveston, except where actual cost to E. R. Sherburne Company is in excess of market price; in that event, to be billed by E. R. Sherburne Company at actual cost of sugar—in either event plus cost of transporting sugar to Sugarland, Tex.

The Sugarland Industries, as assignee of the original contractors, agreed to pay drafts against these sugars in ten days after presentation for 80 per cent. of the cost of the sugars, such payments to be made in New York at maturity, the refining of the raw sugars to begin by June 1, 1920, for a toll charge of $2.75 per 100 pounds of refined sugars, this charge to be secured for the refinery by billing back the refined sugars to E. R. Sherburne Company at a price of cost f. o. b. Sugarland plus $2.75 per hundred, refining charge, the refinery delivering to E. R. Sherburne Company 92½ pounds of refined sugar for each 100 pounds at 96 degrees test raw sugar received.

It was further agreed that, inasmuch as the refinery had purchased raw sugars covering its melting capacity until June 1, 1920, which were to be melted prior to the commencing of the melting of the sugars provided for in the contract, that should the refinery be prevented from finishing its own meltings by June 1st, due to fires, strikes, or other causes beyond its control, E. R. Sherburne Company should have the option of canceling a sufficient amount of raws to cover the period of delay or of allowing the contract to run a sufficient additional time to cover the melting of a like amount of raw sugar.

The Sherburne Company agreed to provide and keep ample raw sugar supplies, consisting of not less than 50,000 bags monthly, commencing deliveries about May 15th, and in case of its failure to maintain sufficient supplies of raws up to 50,000 bags monthly deliveries, if the refinery should sustain a loss on account of being shut down, Sherburne Company should pay actual losses occasioned by such shutdowns, based upon the result of one month's steady operation under the contract.

It was further agreed that the defendant refinery should have the refusal of all refined sugars produced from the raw sugars to offer to its regular trade at a price to be made by Sherburne Company, the refinery to account to Sherburne Company for all sales upon the agreed basis price f. o. b. cars Sugarland, all out-bound freight differentials accruing to the refinery, price fixed by Sherburne Company to be subject to the regular trade discount of 2 per cent. for cash in seven days from arrival at destination of shipment, and that in addition to said 2 per cent. discount on refined sales Sherburne Company was to assume regular brokerage cost of 4 cents for each 100 pounds sold.

It was further agreed that, in consideration of the defendant agreeing to finance 80 per cent. of the cost of said raw sugars by paying drafts drawn against deliveries to that extent as provided in the contract, E. R. Sherburne Company should pay interest at ——— per

cent. on the advances, together with all cost of exchange necessary for the transfer of funds.

There were further practical operating and other details in the contract which are not necessary to be set out.

That deliveries were made under said contract by the Sherburne Company as follows:

On the 14th day of May, 1920, 16,376 bags arriving by steamship Olinda.

On the 2d day of June, 1920, 21,962 bags arriving by steamship Lake Dancy.

On the 5th day of June, 1920, 18,312 bags arriving by steamship Tustan.

On the 6th day of July, 1920, 14,968 bags arriving by steamship J. S. Whitney.

, On the 16th day of July, 1920, 23,389 bags arriving by steamship Corcoran.

On the 25th day of July, 1920, 39,994 bags arriving by steamship Agwistar.

That all of these deliveries, with the exception of those by the steamship Agwistar, had been made prior to July 23, 1920, and a large portion of the same had been manufactured and sold under the contract long prior to July 23, 1920, and that plaintiff on or about that day represented to the defendant that it had entered into arrangements, with E. R. Sherburne Company to advance to it for its account 20 per cent. of the cost price of the sugars embraced within the shipments above mentioned, except the steamship Agwistar; that by the execution of instruments which would show plaintiff's right to 20 per cent. of whatever amount should be due and owing E. R. Sherburne Company, after the discharge of its obligations to defendant, the Sugarland Industries, under this contract, plaintiff would be aided in its financial arrangements with E. R. Sherburne Company; and that, although no consideration existed therefor, and purely for the accommodation of plaintiff and without any consideration, defendant, on July 23, 1920, executed the several receipts in plaintiff's bill of complaint described, and that the execution of said receipts was without consideration and invalid.

The defendant further alleges that each of said receipts was made subject to the terms of the Sherburne contract and was made at a time when the plaintiff well knew that bills of lading for each of said shipments had been fully accomplished, and that full and complete title and dominion over each of said shipments had passed into defendant, and that at the time of the execution of the receipts plaintiff had no title or lien upon either of the shipments, or upon the proceeds of same, and that the legal effect of said receipts declared upon the plaintiff, each of which became and was a part of the Sherburne contract with defendant, was to assign to plaintiff whatever sum might be due from defendant to Sherburne Company, if any, after the full execution of defendant's contract with Sherburne Company, including the receipt and refinery of the cargo of the steamship Agwistar, to the extent that such surplus, if any, equaled 20 per cent.

of the original purchase price of the cargoes of said steamship, with the exception of the Agwistar.

Defendant further alleges that it has manufactured and sold each and all of said shipments in accordance with the terms of the contract, and that, including the sum of $500,075.84 due for damages by reason of the failure of Sherburne Company to furnish sugars in accordance with contract, there is due from Sherburne Company to defendant the sum of $2,031,113.75 under said contract, which sum Sherburne Company has wholly failed to pay, being wholly insolvent, proper effort having been made to collect the same; and that therefore there is nothing due to plaintiff under the contract which is made a part of the trust receipts declared upon.

Of the eight trust receipts shown in the record, the first is typical of all, and reads as follows:

"Old Colony Trust Company

"Agent's Receipt.

"Received from Old Colony Trust Company, hereinafter called the 'Trust Company,' the following goods and merchandise, their property specified in the following bill of lading per S. S. Olindy 16,375 bags sugar.

"The bill of lading and the goods and merchandise represented thereby, and any other documents of title which may be issued in respect thereto, are held by us only as agents for the trust company with the restricted powers herein contained.

"It is agreed that we are to have the power to manufacture and sell the same and we agree to hand over the proceeds of such sale, after deducting advances made by us and our charges for refining and handling in accord with contract between the E. R. Sherburne Company, W. T. Eldridge, Esq., and S. E. Kempner, Esq.

"The Trust Company may cancel this authority at any time and repossess itself of said bills of lading and other documents of title or the property in whatever condition it may then be, or the proceeds thereof, if sold, or the manufactured goods or their proceeds, wherever the same may be found; and we do hereby assign and transfer to said Old Colony Trust Company the accounts of the purchaser or purchasers of said property, to the extent of the purchase price thereof, subject to the provisions of the paragraph next preceding, providing for our advances cost of refining, and handling said sugars.

"We further agree to keep said property insured against fire, payable in case of loss to the Trust Company with the understanding that they are not to be chargeable for any expenses incurred thereon, the intention of the arrangement being to protect and preserve the title of the Trust Company to the goods, or the proceeds thereof, without expense.

"No waiver, express or implied, of any provision hereof shall prevent the exercise at any time of any rights conferred by provision so waived.

"The Sugarland Industries,

"W. T. Eldridge, Jr., Vice President.

"Acceptances $851,000.

"Commercial Credit No. 1420.

"Dated July 23, 1920.

Upon the pleadings thus presented, the case went to issue, resulting in practically no controversy on the facts, but a sharp controversy on the law governing the respective theories of plaintiff and defendant. These theories in their claimed relation to other settled theories of law have undergone some mutations in the course of the extended and various arguments, written and oral, which the case has given rise to; but fundamentally and substantially they have remained the

same, plaintiff's theory being that it held a banker's title as to each lot of sugar covered by each separate trust receipt, and that by virtue of said banker's title it is entitled to demand compliance with that part of the trust receipt reading as follows:

"We agree to hand over the proceeds of such sale, after deducting advances made by us and our charges for refining and handling in accord with contract between the E. R. Sherburne Company, Eldridge and Kempner."

That the advances and charges referred to in that agreement were thus made upon and incurred against the particular lots of sugar mentioned in the particular receipts. That therefore each lot was to stand upon its own footing and the basis of the accounting should be to determine as to each lot whether there was a deficit or excess. As to any lot where a deficit was shown, of course Sugarland was to owe them nothing. As to any lot where there was an excess shown, Sugarland was to pay them all over that excess.

Sugarland's theory was that these trust receipts were executed as to most of the lots of sugar after they had been received by Sugarland and partly melted, and that as to all of them the receipts were merely intended to express the understanding that if there was any money due Sherburne upon the whole contract, after all of the debits and credits between Sherburne and Sugarland were adjusted, this would be paid over to Old Colony, but that if there was a deficit on the whole accounting, Old Colony was to receive nothing.

In addition to this general claim of offset, Sugarland made the claim that at least all sugars in which Old Colony claimed an interest must be treated as one lot irrespective of the fact of the different shipments, and the different trust receipts, and that the accounting should be made upon a basis of the ascertainment of the general debit or credit on the entire lots.

The case came on for trial upon the general right to an accounting in November, 1921, and it was considered by the court that the plaintiff's theory was right, at least to the extent of a separate and independent accounting for each lot of sugar covered by each of the trust receipts.

The memorandum filed by the court on which the decree for accounting was entered declared that while the court discarded the theory of Sugarland that the lots of sugar should be treated as an entirety, rather than as separate transactions, it also declined to follow the theory of plaintiff that it was entitled to receive from each lot not only the excess up to the amount which it had advanced on that particular lot, but any balance over that specificc advance to apply upon its general lien for security of the general indebtedness of the Sherburne Company to it arising on other lots and other transactions.

Upon this decree the case went to a master, who after much argument and evidence returned into court an account of each of the separate lots of sugar, which account showed that, taking the lots as an entirety on which plaintiff had made advances, the deficits exceeded the excesses. Considering only the excesses, that Sugarland had received $874,414.74 excesses on certain of the lots. Limiting these excesses in accordance with the court's memorandum to the amount

advanced by plaintiff on each lot, it received $707,003.65 of excesses to which plaintiff held banker's title.

The accounting showed that in one instance, through some oversight, defendant had overpaid on account of two of the lots $99,447.-59; deducting this amount from the total excesses, a balance was shown of $774,967.15, which the plaintiff contends it should receive under the terms of the trust receipts, or a balance of $607,556.06 due by Sugarland, upon the theory announced by the court in its original memorandum.

The report of the master showed that as between Sugarland and Sherburne, Sherburne owed Sugarland $2,739,173.26. The master summarized his findings in the form of theories as follows:

Theory 1. Should the court adhere to the theory announced in the memorandum opinion filed to the effect that defendant is the holder of a first mortgage on each separate lot of sugar for its advances and charges thereon, plaintiff is the holder of a second mortgage on each separate lot of sugar for its unpaid advances thereon, and that these mortgages cannot be extended by either party to any one of the other lots the result would be judgment for plaintiff against defendant in the sum of $607,556.06 with interest at 6 per cent. per annum from September 1, 1920, $99.87 per day, until paid.

Theory No. 2. Should the court adopt the theory for which the plaintiff will contend, that the defendant, by executing the trust receipts, agreed to hand over to plaintiff the proceeds from the sale of each lot of sugar, less charges on account thereof, the result would be judgment for plaintiff against defendant in the sum of $774,967.15, with interest at 6 per cent. per annum from September 1, 1920, $127.-39 per day.

The master further announced that should the court adopt the theory advanced by the defendant that it had an overriding lien on all of the sugars to recoup its advances out of them as a whole, and not as in separate lots, judgment should go for the defendant.

The report of the master contained other and various findings, to which exception was taken by the plaintiff upon the coming in of that report; but on the final argument of the case before this court all of those exceptions were abandoned, and the matter was submitted to the court upon the master's findings of fact as to the state of the account, for the court to determine whether the defendant was entitled to a judgment on its theory, or whether the plaintiff was entitled to judgment either on the theory announced by the court, as set out in the master's theory No. 1, or on that claimed by the plaintiff in the master's theory No. 2.

Counsel have in exhaustive oral arguments and written briefs ingeniously and interestingly presented their views, and the court, after listening, reading, and investigating, finds himself in the position described by old Omar in these lines:

"Myself when young did eagerly frequent
  Doctor and Saint, and heard great argument
  About it and about; but evermore
  Came out by the same door wherein I went."

In less poetical phrase, notwithstanding the arguments of the defendant, supported as they are by the concurring opinion of the master overruling the court's first view, and notwithstanding the arguments of plaintiff, supported by the views of Prof. Samuel Williston, whom the plaintiff has marshaled up as though invincible, I find myself unshaken and unchanged.

The arguments have taken the widest range. In the beginning of this controversy the defendant asserted with vigor the right to charge Old Colony with all of the debts due by Sherburne, asserted that Old Colony's position was that of a holder of an unrecorded chattel mortgage which was void under the law; that the trust receipts were without consideration, and therefore not binding; that the reference in the trust receipts to the Sherburne contract made that contract in its full terms a part of the trust receipts and subjected the lot in each trust receipt to all the charges against the whole Sherburne contract.

After the relation of the plaintiff to the lots of sugar had become better apprehended by the defendant, and the issues in the case had shaken down until the real ones rose to the top, the wheat in the case, as far as defendant's side was concerned, appeared to be, as stated by them:

(1) "That Sugarland was a factor instructed by others with possession of their property, on which, with the consent and at the instance of the others," it rendered services, made advances, and incurred expenses as such factor.

(2) "Of this factor not only Sherburne, but Old Colony, was a principal, each to the extent of its interest in the property consigned."

(3) "Where such a relation exists, a lien growing out of it is given by law, not only on each lot or consignment delivered for the charges accruing specifically against it, but on everything coming into the hands of the factor by virtue and in the course of the agency, to secure the factor for all his charges. This lien is not only a specific one as against specific property for the charges against it, but it is a general one against all property in hand at any time for any balance due the factor."

(4) "To the existence of this lien no contract was essential other than that which gives rise to the relation, nor does a special contract, though in writing, and making no mention of the lien, exclude it unless the contract contains provisions wholly inconsistent with its existence. No contract or other paper or fact in this case contains anything inconsistent with or militating against the full operation of the lien, but it is true, on the contrary, that a recognition and enforcement of it is necessary to the doing of justice."

It is evident from these contentions that defendant's former contentions, that the full Sherburne contract was a part of the trust receipts, that the trust receipts put the plaintiff in the position of the holder of an unrecorded chattel mortgage, and that there was no consideration for the trust receipts, are abandoned, and that the defendant is resting its case upon the proposition of an implied general factor's lien against the entire properties of Old Colony intrusted to it for any losses accruing to Sugarland by reason of advances on account of, or labor performed on, Old Colony sugars.

The case having settled down to this contention, which is in very truth the crux of it, Old Colony replies that it is true that Sugarland is a factor as to Sherburne, and that a general lien would have, apart even from the provisions of the Sherburne contract, arisen in favor

of Sugarland against Sherburne as to all sugars intrusted to it; that as to Old Colony and Sugarland, the true relation is not that of principal and factor, but if it was the trust receipts by express contract securing the rights and obligations of the parties to them are not only inconsistent with, but leave no room for implication of a general lien on other lots for balances due on a particular lot, and a subjecting of the excesses on some of the lots to the satisfaction of deficits accruing on other lots; and around these two principles the storm of argument and counter argument has raged.

I am inclined to the opinion that, upon principle, the contention of Old Colony on the first point is sound; that the relation of factor and principal never arose as between it and Sugarland.

I am persuaded that the essential character of the banker's title as discussed and established in Century Throwing Co. v. Muller, 197 Fed. 252, 116 C. C. A. 614, and other federal cases before and since, make it clear that while that character of title is merely a security, and therefore a lien for the purpose of obtaining back the money laid out to the acquiring of goods, it in truth springs into the position of a title whenever analogies which would defeat it, such as the theory of unrecorded chattel mortgage, and other difficulties thrown around chattel mortgages, are raised to prevent its beneficial application.

That it never exists as, nor can be distorted into, an unqualified ownership of goods as a basis for destroying it by implication from such unqualified ownership which are inconsistent with the real nature of the security title. That looking at Old Colony's interest in these goods in the light of that principle, it must be clear that Old Colony did not enter into any relation whatever with Sugarland except that of a person having a security title to the extent of 20 per cent. which it had subordinated by agreement to the claims of Sugarland for the moneys advanced and laid out on that lot of sugars.

In addition, I am strongly impressed with the argument that there can be no lien without a debt, and under the terms of this arrangement between Old Colony and Sugarland, Old Colony was not to be responsible to Sugarland in any event.

It is true that in the brief for Sugarland counsel present authorities, and argue with ability, that personal liability for a debt is not essential to a lien; but it appears to me that this begs the question.

It is true that there can be a lien without personal liability for the debt as to which the lien is an incident, when by express agreement the personal obligation is negatived; but it is also true that there can be no lien without a debt, and that there can be no debt without an agreement, express or implied, that an obligation is owing; and it is also true that no debt can arise unless at the time of its rising a personal liability inhered in it, because things do not owe debts, they merely provide security for their payment.

Nor is this statement at all militated against by those authorities which hold that there may be a claim with demand calling for money which can be enforced only by subjecting the property or the fund on which no one personally is liable to pay, for there an express agreement has saved against personal liability.

In the transaction at bar the trust receipt shows clearly that it never was expected not contemplated that there should be a debt or claim against Old Colony which should have vigor either to require satisfaction out of Old Colony personally or out of any of its property, except the very property against which the precise advances were made.

Assuming, however, that all of this discussion is merely dialectic, a "titheing of mint, anise and cumming," and that whether there was ever a debt of such general incidence as that it would support a charge against other property than that described in the particular advances, is on the face of the papers and the facts resolvable in favor of Sugarland's contention, it yet appears plain to me that Sugarland's theory of a general lien arising out of the facts in this case is wholly without foundation.

Whenever I have approached the study of common law abstractly and from the standpoint of its origins, its growth, and its function, I see far more clearly than when I search it out to find a weapon of offense or of defense in the trial of a case; I become more clearly convinced that resort to first principles is, in the last analysis, the only safe way to a solution of litigated matters. This case is a most striking illustration of the point.

Here both plaintiff and defendant are so intent, the one upon demolishing, the other upon establishing, the existence of the relation of factor and principal, that they have both overlooked the fact that that relation is, in its analysis, merely a contract relation around which common law has built implied contracts upon a realization of what is customary and usual between persons occupying such relations, and so, as in the case of other relations arising under the general law of contracts, these relations have come to be looked upon as themselves constituting first principles, rather than as ruled by first principles.

So we have here a furious contest over whether the relation of factor and principal exists, both sides assuming that all of the implied contracts ordinarily assumed out of that relation by the course of common law exist, unless they are contracted away by some character of waiver or exemption; whereas if the matter is approached from the standpoint of first principles, these discussions would vanish into thin air.

And what are these first principles? Any primary text-book on contracts carries them. (1) A contract rests upon either an express or an implied agreement to do or not to do certain things. (2) That where there is an express contract, no room for implications arises.

That the lien which counsel for Sugarland is seeking to impose in this case is one arising out of implied contract is plain from the quotation in Plattner Implement Co. v. International Harvester Co., 133 Fed. 376, 66 C. C. A. 438, cited in their brief. In that quotation Judge Sanborn says:

· "A lien in favor of a factor is implied by law, without an express agreement between the parties, upon all the goods in the hands of a consignee who is given the power to sell them for the advances which he makes for his consignor in conducting the business of his agency."

It is the law that an implied contract and an express contract cov-ering the same matter are necessarily exclusive of each other; they cannot coexist. This is clearly and happily put by the Supreme Court of Texas in Phoenix Lumber Co. v. Houston Water Co,, 94 Tex. 456, 61 S. W. 707:

"Evidence of an express contract would not be admissible under the allegations of, and if admitted would not establish, an implied contract. * * * If there was an express contract, there could be no implied contract arising out of the acts of performance of it. The one is destructive of the other. Two things which cannot coexist will not constitute one and the same thing."

Therefore it is, and always has been, the law that the implications of a relation such as that of factor and principal, bailor and bailee, pledgor and pledgee, cannot be looked into, to destroy, vary, or affect the terms of an express contract, because those implications cannot arise except in the absence of an express agreement, which, when it exists, is exclusive.

In this case the agreement between Sugarland and Old Colony was express, and in writing. It states clearly and without equivocation what the parties have agreed to, and what each is to do, and in this agreement is the exact and definite statement:

"We agree to hand over the proceeds of such sale, after deducting advances made by us and our charges for refining and handling in accord with contract between the E. R. Sherburne Company, Eldridge and Kempner."

Further the instrument provides:

"We further agree to keep said property insured against fire, payable in case of loss to the 'trust company' with the understanding that they are not to be chargeable for any expenses incurred thereon, the intention of the arrangement being to protect and preserve the title of the 'trust company' to the goods, or the proceeds thereof, without expense."

Out of such an instrument how is it reasonable to draw the deduction, and from what part of it is the deduction drawn, that the proceeds of the sale, after deducting the advances, are to be held by Sugarland for use in the liquidation and discharge of indebtedness which may rise later against Old Colony, or on account of properties committed to it under the Sherburne contract on which Old Colony holds a banker's title?

So it seems to me that in the light of the express contracts in this case, as shown by the eight trust documents, no basis for the ordinary implication of a general lien for general advances can arise.

[2] In addition, if it be assumed that the relation of factor and principal does arise, notwithstanding the wording of the trust documents, it is plain that under the authorities applicable even to that relation the existence of the express agreement in this case prevents the operation of those ordinary implications, the entertaining of which has built up the law of factor and principal. See Walker v. Birch, 6 Term Reports, 258, in which Lord Kenyon states:

"There is no doubt, and indeed the point has been so long settled that it ought not now to be brought into dispute, but that in general a factor has a lien for his general balance on the property of his principal coming into his hands. But the question here arises on the application of that proposi-

tion to the present case. It is a maxim as old as our law, conventis vincit legem. * , * * The lien which a factor has on goods of his principal arises upon an agreement which the law implies; but where there is an express stipulation to the contrary, it puts an end to the general rule of law."

See Schiffer v. Feagin, 51 Ala. 335, in which case the court follows Walker v. Birch and declares that a factor has a general lien for any balance due him, but he cannot assert this lien in opposition to the terms of a special contract under which he receives the goods. See, also, Hutchins v. Olcutt, 4 Ver. 549; Webster v. Keck, 64 Neb. 1, 89 N. W. 410; Evans-Snider-Buell Co. v. First National Bank of Amarillo, 15 Tex. Civ. App. 163, 39 S. W. 213.

From these authorities I conclude:

(1) That the relation of factor and principal never arose as between Old Colony and Sugarland.

(2) That if it did arise, certainly it arose under the terms of the express contract, which on the maxim, "Expressum facit cessare tacitum," limited the arrangement to what was expressed, and I am therefore of the opinion that the plaintiff is entitled to have, in accordance with the terms of its receipts as to each lot, any balance remaining in the hands of Sugarland after the advances against that particular lot are satisfied.

It would appear that to be consistent with this conclusion the court ought to go the whole way with plaintiff, and hold that plaintiff can have back from Sugarland not only the 20 per cent. remaining due it of its advances for the purchase of these goods, but any excesses for application to its general debt against Sherburne, since the agreement was express, and, without limitation, requires the handing over of the entire balance as to each lot.

That the construction placed by the court upon the trust receipts in opposition to the claim of Sugarland for a general lien does not compel the adoption of plaintiff's theory to the extent contended for by plaintiff is clear, I think, upon two strong and convincing considerations: The first, that a proceeding for an accounting being strictly equitable, must proceed ex æquo et bono, so that a, defendant will be required to account only to the extent that it is just and equitable for him to do so; and, second, that the banker's or security title which the plaintiff is here asserting avails plaintiff under well-settled authorities only to the extent necessary to protect itself in the advances made on the particular lot to which it has acquired this banker's title by laying out its price, and does not extend as against third parties to enable it to take money or property from third parties having claims against its debtor, either for the benefit of its debtor, or for the benefit of its own general balances against the common debtor.

If the facts established here that Old Colony lost nothing by these transactions, and was in a position to obtain back every dollar which it had advanced to Sherburne on account of these various lots, it would be clear that Old Colony could not, because of the language of the trust receipts, take from Sugarland, which admittedly has as against Sherburne a lien for its protection upon all of the assets of Sherburne in its hands—property or proceeds thereof held by Sugarland merely in order to turn them over to Sherburne. Such a judg-

ment upon these trust receipts would be a judgment upon a bond, harsh, unreasonable, and inequitable as to Sugarland, and wholly contrary to the principle of an accounting ex æquo et bono, which requires only that Old Colony receive from Sugarland that which is due to it, and not that it take from Sugarland for the benefit of Sherburne proceeds which are due it to protect it in its advances to and debts due from Sherburne.

This I think all will concede. The insistence of Old Colony is based upon its position that it suffered an actual loss on other cargoes, which it had a banker's title to, of nearly a million dollars, and that under the letter of credit which it issued to Sherburne it held and holds a general lien upon the excesses of some of the cargoes to recoup it for its losses and deficits on others.

Apart from the character of the banker's title asserted here, which, as we have seen above, is created and exists for the protection of the holder to the extent of the moneys laid out in the purchase of the thing in controversy, I think it not ex æquo et bono that the claim of Old Colony to have the trust receipts operate, in so far as regards Sherburne's general indebtedness to it, so as to overcome the general lien of Sugarland; but the matter is not an open one, for it is well settled that the courts will not press the theory of the particular title asserted here beyond the necessity of securing to the banker the advances made by him on that particular property which his money has been laid out to purchase, and for the security on which this banker's title is raised.

Many cases, principally in the federal courts, discussing the banker's title, might be referred to in support of this view; but I think it sufficient to quote from Drexel v. Pease, 133 N. Y. 129, 30 N. E. 732:

"Nothing" in these cases "gives color to the idea that the correspondent's ownership is of that character which would permit his exaction, even though agreed to by the principal, of a general lien upon the property for other and prior indebtedness of the principal as against one in the situation of St. Amant. The correspondent's position is one of ownership so far only as is necessary to secure him for the advances he made upon the merchandise described in the bill of lading."

Being therefore still of the opinion that the basis of the accounting as first ordered by me was correct, it is my judgment that upon the findings of the master which are not disputed under his theory No. 1, plaintiff recover $607,556.06, with interest at 6 per cent. per annum from September 1, 1920, and a decree will be so entered.